2022 IL App (4th) 210288

FILED
February 8, 2022
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* M.D., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Brown County |
|       Petitioner-Appellee, | ) | No. 19JA6 |
|       v. | ) | |
| Madison V., | ) | Honorable |
|       Respondent-Appellant). | ) | Jerry J. Hooker, |
| | ) | Judge Presiding. |

---

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices DeArmond and Holder White concurred in the judgment and opinion.

**OPINION**

¶ 1        Respondent, Madison V., is the mother of M.D. (born March 2019). In March 2021, the trial court found respondent to be an unfit parent and found termination of respondent's parental rights would be in the minor's best interest. Respondent appeals, arguing only (1) she received ineffective assistance of counsel when counsel failed to object to the introduction of inadmissible hearsay through judicial notice of the court file and (2) the trial court abused its discretion by taking judicial notice of the entire court file. We disagree and affirm the trial court's judgment.

¶ 2                                    I. BACKGROUND

¶ 3                    A. The Neglect Petition and Adjudicatory Hearing

¶ 4        In November 2019, the State filed a petition for adjudication of wardship, alleging M.D. was a neglected minor as defined by section 2-3 of the Juvenile Court Act of 1987 (Juvenile

Court Act). 705 ILCS 405/2-3 (West 2018). In support, the State alleged the following facts: (1) M.D. was residing with respondent in a home with M.D.'s maternal grandmother, Chaina D., who was a registered sexual predator in Illinois due to a conviction in Kansas for permitting the sexual abuse of a child; (2) after giving birth to M.D., respondent moved to Illinois to live with Chaina D., knowing Chaina D. to be a sexual predator because respondent was the victim of Chaina D.'s abuse; (3) respondent left M.D. in the care of Chaina D. for a week while respondent traveled out of state; (4) M.D. was not receiving medical treatment for a congenital hearing defect; and (5) respondent has been diagnosed with "bi-polar [disorder] and depression."

¶ 5 The same day the State filed this petition, the trial court conducted a shelter care hearing and placed temporary custody and guardianship with the guardianship administrator of the Department of Children and Family Services (DCFS).

¶ 6 In January 2020, the court conducted an adjudicatory hearing. The State withdrew the allegations concerning M.D.'s medical care and respondent's mental health and proceeded on the allegations regarding M.D.'s residing with and being left alone with Chaina D.

¶ 7 At the conclusion of the hearing, the trial court adjudicated M.D. to be a neglected minor.

¶ 8 B. The Dispositional Hearing

¶ 9 In May 2020, the trial court conducted a dispositional hearing, at the conclusion of which it entered a written order (1) making M.D. a ward of the court, (2) finding respondent unable for reasons other than financial circumstances alone to care for M.D., and (3) finding that placement with respondent would be contrary to M.D.'s health, safety, and best interest. The court continued custody and guardianship of M.D. with the guardianship administrator of DCFS. The court noted in its written order that respondent's "mental health issues and parenting issues must

be resolved." The court's order also stated, "The parents are admonished that they must cooperate with [DCFS]. The parents must comply with the terms of the service plan and correct the conditions that require the minor to be in care or they risk termination of their parental rights." (We note M.D.'s father appeared at the shelter care, adjudicatory, and dispositional hearings. After the dispositional hearing, he did not personally appear again but was represented by an attorney. His parental rights were ultimately terminated, and he does not participate in this appeal.)

¶ 10                    C. The Petition for Termination of Parental Rights

¶ 11            In October 2020, the guardian *ad litem* (GAL) filed a petition to terminate parental rights. The GAL alleged respondent was an unfit parent because she (1) failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent for the nine-month period following the adjudication of neglect, specifically, January 24 through October 24, 2020, and (2) failed to make reasonable progress toward the return of the child to respondent during that same nine-month period. 750 ILCS 50/1(D)(m)(i), (ii) (West 2020).

¶ 12                    1. *The Fitness Portion of the Termination Proceedings*

¶ 13            In March 2021, the trial court conducted the fitness portion of the termination proceedings. Respondent did not personally appear at that hearing. (We note that, although the GAL filed the petition for termination of parental rights, the State called the following three witnesses.)

¶ 14                            a. Jenna Fasig

¶ 15            Jenna Fasig testified that she was employed by DCFS and was the assigned caseworker in M.D.'s case. Fasig's job was to make sure that respondent was referred to the services she was required to complete and to make sure that respondent was completing them. Fasig testified that on January 24, 2020, she reviewed respondent's service plan with respondent.

The service plan required respondent to complete a parenting class and a mental health assessment and to maintain employment and housing.

¶ 16        Fasig testified that she identified for respondent three facilities at which she could complete the mental health assessment. Respondent "reached out" to "Memorial Health" but was placed on a waiting list. Fasig stated that she referred respondent for individual counseling at Hobby Horse House (a contract service agency) while they waited for the mental health assessment because respondent "was diagnosed with bipolar, anxiety, and depression." Respondent ultimately completed the mental health assessment on September 1, 2020.

¶ 17        Fasig also testified that she referred respondent to Hobby Horse for parenting classes but that respondent failed them twice. Fasig stated that respondent was not "being honest in obtaining the material in classes," so Fasig referred her for "parent coaching," which was more "one-on-one" than a class setting. Fasig testified that respondent did not attend the parent coaching. Fasig explained that Hobby Horse tried contacting respondent for "months" to set up the coaching sessions and Fasig told respondent to set them up but "that was never done."

¶ 18        Fasig further testified that respondent had two visits a week with M.D. for two hours each. At the end of August 2020, respondent told Fasig that she was moving to Oklahoma. Fasig testified that she advised respondent it was not in her best interest to move because both M.D. and respondent's services were in Illinois. Respondent assured Fasig that respondent would continue her visits and continue her counseling by phone. Fasig told respondent that phone counseling was not an adequate substitute for in-person counseling. Despite Fasig's advice, respondent moved to Oklahoma.

¶ 19        Fasig testified that respondent continued her counseling over the phone but did not participate in visits. Specifically, Fasig testified that respondent missed four visits in September

2020. As a result, in October 2020, respondent's visits were reduced to once weekly for two hours. When asked whether the visits had occurred, Fasig answered, "No." When asked, "Did they ever occur?" Fasig answered, "They used to when [she] lived here." Fasig testified that the last visit occurred on October 6, 2020.

¶ 20    On cross-examination by respondent's counsel, Fasig acknowledged that, during the relevant nine-month period, respondent twice attended a full course of parenting classes and obtained a mental health assessment. Regarding employment, Fasig testified that respondent was employed at McDonald's "for a couple of weeks" but "she couldn't get along with her co-workers, so she quit." Regarding housing, Fasig testified that respondent provided safe, suitable housing. Fasig also acknowledged that respondent engaged in visits prior to September 2020.

¶ 21    Also on cross-examination, the GAL asked whether, as part of her mental health assessment, respondent was "directed to follow up with any recommendations." Fasig answered, "Yes. Her recommendations were that she needed to see a psychiatrist for medication management. She needed to continue counseling, and she needed to do parenting classes." Fasig testified that respondent was offered parenting classes three times but never completed them successfully. Fasig also testified that respondent did not complete the other follow-up recommendations.

¶ 22    At this point in the proceedings, the GAL paused his examination of Fasig and stated, "Judge, before I forget, I would ask the Court to take judicial notice of the file as part of this." The trial court replied, "Court will take judicial notice of 19-JA-6."

¶ 23    The GAL then continued his examination of Fasig, who testified that, after respondent quit her job at McDonald's in August 2020, she obtained employment at Dollar General. However, after moving to Oklahoma in September 2020, respondent did not report any subsequent employment to Fasig.

- 5 -

¶ 24　　　　Fasig testified that she referred respondent for a mental health assessment on January 24, 2020, but it was not completed until September 1, 2020. When asked if there was a reason why it took so long, Fasig testified that respondent told her two facilities would not take her insurance. However, when Fasig contacted those facilities, she learned that they would take respondent's insurance. Fasig answered affirmatively when asked, "So, that was the only thing that stopped her from doing it, supposedly, was this insurance issue when, in fact, her insurance would be taken?" Fasig also answered affirmatively when further asked, "So, in essence, she stopped herself?"

¶ 25　　　　The trial court then questioned Fasig regarding visits. Fasig testified that from January 24 to the end of March 2020, respondent had two visits per week with M.D. From the end of March to the beginning of July, she had weekly video chats. After July, the visits returned to in-person. Respondent did not miss any visits until after she moved to Oklahoma in September 2020.

¶ 26　　　　　　　　　　　　　　b. Laura Brooks

¶ 27　　　　Laura Brooks testified that she was employed by Hobby Horse as a counselor and provided respondent's counseling services in this case. Brooks testified that the purpose of respondent's counseling was "to address her trauma history and see how it was relevant to her actions as to why [M.D.] was removed in the first place and to try and help her resolve those issues that she has." Brooks testified that respondent attended her counseling sessions but "[s]he did not really make much effort to discuss her past trauma." Brooks stated that, instead, respondent wanted to discuss "[t]he incompetence of all of us."

¶ 28　　　　Brooks testified that she saw respondent "weekly starting in June" but that the in-person sessions stopped when respondent moved to Oklahoma. Brooks advised respondent that it was not in her best interest to move to Oklahoma because she would be far away from M.D. and

unable to do services in person.

¶ 29     Regarding the phone sessions, Brooks testified that, much like the in-person sessions, respondent would not discuss her "actual trauma history and how to reconcile that within herself." Brooks testified that respondent missed a few sessions but was generally very consistent in her attendance.

¶ 30     When asked whether the sessions were "beneficial to the return of the child," Brooks answered, "No." Brooks explained, "[I]f she does not recognize what her past trauma has done for her decisions, the basic needs of her own children may not be recognized."

¶ 31     On cross-examination, the GAL asked Brooks whether her counseling sessions with respondent had led to "any progress toward actually returning the child home to her." Brooks answered, "No. [Respondent was] just venting." The GAL next asked, "So, in other words [respondent's counseling has] basically been a big waste of time?" Brooks answered, "Yes."

¶ 32     Brooks also testified that respondent had reported she had a "perfect childhood," which was not consistent with what Brooks knew about respondent's childhood. Brooks explained that respondent's "counseling failed because she couldn't recognize or acknowledge her past trauma, and she minimized the effect of it, which can in turn minimize the effect of her effective parenting and decision-making as an adult." Brooks agreed that the underlying situation in M.D.'s case was respondent's having M.D. in the presence of respondent's mother, who was a child molester. Brooks also agreed that respondent's minimization of her molestation by her mother meant that particular problem was not being addressed at all. Brooks further agreed that respondent's leaving M.D. with respondent's mother meant there had been no progress correcting the conditions that led to "this situation."

¶ 33                         c. Brittany Westlake

¶ 34        Brittany Westlake testified that she was employed at Hobby Horse and served as the co-facilitator for respondent's parenting class in February and March 2020. Westlake testified that respondent participated, was engaged, and seemed to pay attention. However, respondent's scores on the posttest assessment either remained the same or decreased from respondent's pretest assessment scores.

¶ 35        Westlake testified that respondent enrolled in another parenting class almost immediately after the first. Although Westlake did not facilitate this second course, she was aware that respondent "failed and that her scores did not improve."

¶ 36        Westlake testified that, following the second posttest assessment, respondent's husband told Westlake that respondent had a learning disability. However, respondent had reported in her assessment that she graduated from high school and did not indicate any need for extra services or accommodations. Moreover, respondent never appeared to have any problems reading or comprehending the written class materials.

¶ 37        On cross-examination, Westlake testified that, on the pretest assessment, respondent scored herself as a 10 out of 10 regarding her childhood. To Westlake, this would indicate "[a] childhood free from any kind of neglect or abuse, very caring, loving, perfect, basically." Westlake testified that this did not match up with what she knew of respondent's background. Specifically, Westlake was aware that (1) respondent had been "sexually abused by her mother's boyfriend with her mother being involved when [respondent] was a small child" and (2) the abuse respondent suffered resulted in respondent's being removed from her mother's care. Westlake testified that the evaluation criteria for each parent includes "accountability" and "self-disclosure." Respondent was not able to achieve a passing score for either of those criteria. Westlake agreed that respondent's actions caused parenting classes to be "a waste of time."

¶ 38 Westlake testified that she had a bachelor's degree in psychology, had been a social worker for 25 years, and was currently part of the Hobby Horse counseling team. She opined that respondent made no progress toward resolving any of her issues and made no progress in her parenting classes.

¶ 39 d. The Trial Court's Findings

¶ 40 At the conclusion of the fitness portion of the termination hearing, the trial court issued an oral ruling finding respondent unfit. The court found that the State had proved by clear and convincing evidence that respondent failed to make (1) reasonable efforts and (2) reasonable progress. The court explained its ruling, in part, as follows:

"[Respondent] has failed to correct the conditions that were the basis for the removal of the child. Specifically, she did, in fact, leave the child with a registered sex offender. And, although, she has completed mental health assessment and actually taken the classes to completion, she has failed to pass them; specifically, that she's still not addressing the issues of the past trauma of her own sexual abuse, which DCFS and Hobby Horse both indicate is a severe impediment to her correcting the conditions which were the reason for the removal of the child. The Court would also find that she did not complete the mental health recommendations, that she did not see the psychologist for medications that she was in need of. So, the Court does find that she is unfit[.]

¶ 41 2. *The Best Interest Portion of the Termination Proceedings*

¶ 42 After a brief recess, the trial court proceeded to the best interest portion of the termination proceedings. After hearing evidence and arguments from the parties, the trial court found that it was in M.D.'s best interest to terminate respondent's parental rights.

¶ 43　　　　　This appeal followed.

¶ 44　　　　　　　　　　　　　II. ANALYSIS

¶ 45　　　　　Respondent appeals, arguing only (1) she received ineffective assistance of counsel when counsel failed to object to the introduction of inadmissible hearsay through judicial notice of the court file and (2) the trial court abused its discretion by taking judicial notice of the entire court file. We disagree and affirm the trial court's judgment.

¶ 46　　　　　　　　　A. Accelerated Appeal Filing Deadline

¶ 47　　　　　Initially, we note that this is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Under that rule, this court is required to issue its decision in an accelerated case within 150 days after the filing of the notice of appeal unless there has been "good cause shown." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018).

¶ 48　　　　　Here, M.D.'s notice of appeal was filed on May 19, 2021, and this court's disposition was due to be filed by October 18, 2021. That filing deadline has passed. However, we note that respondent has filed motions for extensions of time and requested oral argument. Specifically, (1) on July 12, 2021, respondent filed a motion for an extension of time to file the docketing statement, (2) on September 8, 2021, respondent filed a motion for extension of time to file the record on appeal and to file her brief, (3) on October 21, 2021 (after the due date for this court's decision) respondent filed her brief and requested oral argument, (4) on November 17, 2021, respondent filed a motion to supplement the record on appeal with missing transcripts, (5) on November 18, 2021, respondent filed a motion for leave to amend her brief, (6) on November 24, 2021, respondent filed her amended brief. Oral argument was held on January 25, 2022.

¶ 49　　　　　Given respondent's motions as well as the need to schedule and hold oral argument, we conclude there is "good cause" for issuing our disposition after the 150-day deadline.

¶ 50                    B. Judicial Notice in Abuse and Neglect Proceedings

¶ 51          One of respondent's arguments on appeal is that the trial court abused its discretion by taking judicial notice of the entire court file. Respondent claims in her brief that this court's decision in *In re J.G.*, 298 Ill. App. 3d 617, 629, 699 N.E.2d 167, 175-76 (1998), supports her argument that "the wholesale admission of the court's file is a reversible error." We disagree with respondent's claim because it misstates this court's holding in *J.G.*

¶ 52          In *J.G.*, an opinion written by then-appellate court justice Rita B. Garman, this court engaged in a lengthy discussion of the proper scope and method of taking judicial notice of the contents of the court file in a parental unfitness proceeding. In fact, this court labeled its discussion in *J.G.* as a "*guide* to the trial courts and counsel *** regarding the practice of taking judicial notice of all contents of the court file at a parental unfitness hearing." (Emphasis added.) *Id.* at 628. We did *not* conclude, as respondent contends, that taking judicial notice of the entire court file is always reversible error.

¶ 53          Although we stated in *J.G.* that "wholesale judicial notice of everything that took place prior to the unfitness hearing is unnecessary and inappropriate," we concluded that the respondent mother was not prejudiced in that case by the trial court's taking judicial notice of the entire court file because "there was more than sufficient evidence of respondent's unfitness properly admitted at the hearing to meet the State's burden of clear and convincing evidence." *Id.* at 629. Accordingly, we affirmed the trial court's orders finding the respondent in *J.G.* to be an unfit parent and terminating her parental rights. *Id.*

¶ 54          Nonetheless, respondent is correct that the trial court and attorneys in this case did not follow this court's guidance in *J.G.* Although their disregard for proper procedure in this case did not rise to the level of reversible error or even prejudice to respondent (as we discuss *infra*

- 11 -

¶¶ 94-105), this case demonstrates that, some 23 years after *J.G.*, litigants and courts either (1) continue to be unfamiliar with the guidance set forth in *J.G.* or (2) choose to not apply it. This remains so despite the Second District's approval of the procedure outlined in *J.G.* in *In re A.B.*, 308 Ill. App. 3d 227, 239, 719 N.E.2d 348, 358 (1999), as well as this court's insistence in *In re A.L.*, 409 Ill. App. 3d 492, 505, 949 N.E.2d 1123, 1133 (2011) that "*we expect the court and parties to comply with* J.G." (Emphasis added.).

¶ 55        Therefore, before examining respondent's claim of ineffective assistance in this case based upon the trial court's taking of judicial notice, we deem it advisable to again discuss the proper procedure for the taking of judicial notice of contents of the court file in a parental fitness hearing.

¶ 56            1. *Legal Issues and Evidentiary Standards in Juvenile Proceedings*

¶ 57        Juvenile abuse, neglect, and dependency cases (hereinafter, "juvenile cases") are unique proceedings that take place in defined steps, which are governed by either the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) or the Adoption Act (750 ILCS 50/1 *et seq.* (West 2020)). Each "step" in the process (or type of hearing) is governed by different rules of evidence and concerns different legal issues.

¶ 58                    a. Temporary Custody Hearings

¶ 59        When a petition has been filed alleging a minor is neglected or abused, a temporary custody hearing, sometimes referred to as a shelter care hearing, is frequently requested and conducted. At a temporary custody hearing, the trial court considers (1) whether probable cause exists to believe that the minor is abused or neglected and (2) whether it is a matter of immediate and urgent necessity for the safety and protection of the minor that the minor be placed in shelter care. 705 ILCS 405/2-10 (West 2020). To make this determination, "all witnesses present shall be

- 12 -

examined before the court in relation to any matter connected with the allegations made in the petition." *Id.* Additionally, the Juvenile Court Act requires that DCFS "shall give testimony concerning indicated reports of abuse and neglect, of which they are aware through the central registry." *Id* § 2-10(2). Further, at this hearing and all other hearings following the filing of the petition alleging a minor is abused or neglected, each designated respondent in the petition is entitled to be represented by counsel. *Id.* § 1-5(1).

¶ 60                                b. Adjudicatory Hearings

¶ 61        Next, at the adjudicatory hearing, the court "shall first consider only the question whether the minor is abused, neglected or dependent." *Id.* § 2-18(1). At this hearing, "[t]he standard of proof and the rules of evidence in the nature of civil proceedings *** are applicable." *Id.*

¶ 62                                c. Dispositional Hearings

¶ 63        If the trial court adjudicates a minor abused or neglected, the case then proceeds to a dispositional hearing, at which the court considers (1) whether it is in the best interest of the child to be made a ward of the court; (2) "the proper disposition best serving the health, safety and interests of the minor and the public"; (3) the permanency goal set for the minor; (4) "the nature of the service plan for the minor"; and (5) "the services delivered and to be delivered under the plan." *Id.* § 2-22(1). At this hearing, the court may rely on all evidence that is "helpful in determining these questions," including oral and written reports, "even though not competent for the purposes for the adjudicatory hearing." *Id.* Essentially, there are no rules of evidence governing what the court may receive and consider at the dispositional hearing. *Id.*; see also *In re D.L.*, 226 Ill. App. 3d 177, 187-88, 589 N.E.2d 680, 686 (1992) ("Although hearsay and other types of incompetent evidence may not be admissible at the adjudicatory hearing, they are admissible at

- 13 -

the dispositional hearing.").

¶ 64        In contrast to the adjudicatory hearing, where the court determines only whether the child is abused or neglected, the wardship determination at the dispositional hearing "is based on the best interest to the child when considering the *totality of the circumstances* surrounding the child's life." (Emphasis added.) *In re D.S.*, 2018 IL App (3d) 170319, ¶ 15, 94 N.E.3d 1227 (citing 705 ILCS 405/2-22(1) (West 2016)). Customarily, to inform the court of the "totality of the circumstances surrounding the child's life," DCFS prepares a "dispositional report" for the court. This report is typically wide-ranging and may reveal deficiencies in a respondent's home in addition to those initially alleged in the neglect or abuse petition.

¶ 65        For example, even though the child was adjudicated neglected based only upon the child's exposure to domestic violence, the dispositional report may reveal the child's mother is addicted to drugs. The court may consider evidence of parental deficiencies in the child's environment beyond those alleged in the petition. See *In re April C.*, 326 Ill. App. 3d 245, 247, 253-54, 260-262, 760 N.E.2d 101, 103, 108, 113-115 (2001) (stating the trial court did not err by admitting at dispositional hearing testimony by respondent's adult daughter that respondent sexually abused her 20 years prior, where the allegations in the petition related only to the physical abuse of respondent's three minor children).

¶ 66        Importantly, if the case proceeds to termination of parental rights, the orders entered at the dispositional hearing are likely to be revisited at the fitness portion of the termination proceedings. This is so because the most common basis for termination of parental rights is a lack of reasonable progress toward the return of the child to the parent (750 ILCS 50/1(D)(m)(ii) (West 2020)). In *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001), the Illinois Supreme Court addressed the proper benchmark for assessing reasonable progress toward the return of the

child and wrote the following:

> "[W]e hold that the benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, *and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent.*" (Emphasis added.)

¶ 67    In reaching this conclusion, the supreme court rejected the Second District's holding (in the same case) that reasonable progress is measured *only* from the situation that triggered the minor's initial removal, and not whether the parent meets the goals set out by DCFS. *Id.* at 209-210, 213. The court reasoned as follows:

> "[The Second District's holding] erroneously assumes that the condition which triggered removal of the child is the *only* condition a parent need ever address in order to achieve the goal of reunification. The parent-child relationship, the environment in the home, and the precise conditions which triggered State intervention do not remain static over time. Thus, the relevant issues are not 'frozen' at the moment custody of the child is taken. [Citation.]
>
> In addition, other serious conditions, existing at the time the child is removed, may become known only after removal, following further investigation of the child, parent[,] and family situation. ***
>
> The necessity of considering other conditions that later come to light is reflected in the broad scope of the investigation authorized [by section 2-21 of the

Juvenile Court Act, under which] the court may order an investigation concerning the 'minor's physical and mental history and condition, family situation and background, economic status, education, occupation, history of delinquency or criminality, personal habits, and any other information that may be helpful to the court' at the dispositional hearing. ***

* * *

*** [T]he benchmark for measuring a parent's progress *** must take into account the dynamics of the circumstances involved; the reality that the condition resulting in removal of the child may not be the only, or the most severe, condition which must be addressed before custody of the child can be returned to the parent ***." (Emphasis in original.) *Id.* at 213-14, 216-17 (citing 705 ILCS 405/2-21(2) (West 1998)).

¶ 68 The supreme court's reasoning and holding in *C.N.* make clear that, when failure to make reasonable progress is alleged, a trial court presiding over the fitness portion of the termination proceedings can and should consider conditions in the child's home environment other than those alleged in the original neglect or abuse petition. Those "other conditions" will often have been identified at the dispositional hearing. However, as we will discuss (*infra* ¶¶ 73-88), the court's consideration of these "other issues" at the parental fitness portion of the termination proceedings must comport with the formal rules of evidence.

¶ 69 *C.N.* also illustrates the importance of the trial court's ability to be informed of all the circumstances in a child's life and to act on that information to ensure that the court's orders serve the best interest of the child. See *In re Arthur H.*, 212 Ill. 2d 441, 464, 819 N.E.2d 734, 747 (2004) ("In any proceeding initiated pursuant to the Juvenile Court Act *** the 'paramount

consideration' is the best interest of the child. [Citation.]" (Internal quotation marks omitted.)).

¶ 70                           d. Permanency Hearings

¶ 71          At a permanency hearing, conducted after the trial court has made the minor a ward

of the court at the dispositional hearing, the court considers (1) the permanency goal contained in

the service plan, (2) the appropriateness of the services contained in the plan and whether those

services have been provided, (3) whether reasonable efforts have been made by all the parties to

the service plan to achieve the goal, and (4) whether the plan and the goal have been achieved. 705

ILCS 405/2-28(2) (West 2020). Permanency hearings are held within 12 months of temporary

custody being taken and every 6 months thereafter, or more frequently, "until the court determines

that the plan and goal have been achieved." *Id.*

¶ 72          At a permanency hearing, "[a]ll evidence relevant to determining [the legal issues

set forth in § 2-28(2)], including oral and written reports, may be admitted and may be relied upon

to the extent of their probative value." *Id.* Notably, "[i]f the permanency goal is return home, the

court shall make findings that identify *any problems* that are causing continued placement of the

[child] away from the home and identify what outcomes would be considered a resolution to these

problems." (Emphasis added.) *Id.* As this court has explained, a permanency hearing is essentially

a continuation of the dispositional hearing, and—just as is the case with a dispositional hearing—

there are no rules of evidence governing what the court may receive and consider at a permanency

hearing. *In re S.M.*, 223 Ill. App. 3d 543, 547, 585 N.E.2d 641, 644 (1992); *In re M.G.*, 2018 IL

App (3d) 170591, ¶ 13, 94 N.E.3d 1287.

¶ 73                           e. Termination Proceedings

¶ 74          If a petition to terminate parental rights is filed, the trial court conducts a bifurcated

proceeding at which it first considers whether the parent is an "unfit person" within the meaning

of the Adoption Act (750 ILCS 50/1(D) (West 2020)). If the court finds that this allegation has been proved, the court then considers whether it is in the child's best interest to terminate parental rights. *In re D.T.*, 212 Ill. 2d 347, 352-53, 818 N.E.2d 1214, 1220 (2004).

¶ 75        The State's burden of proof at the fitness portion of the termination hearing is that the evidence must be "clear and convincing." 705 ILCS 405/2-29(2), (4) (West 2020). Further, the fitness hearing is governed by the Illinois Rules of Evidence. *J.G.*, 298 Ill. App. 3d at 629.

¶ 76        In contrast, at the best interest portion of the termination hearing—like at the dispositional hearing—the trial court may consider "all evidence helpful *** in determining the questions before the court *** even though that evidence would not be admissible in a hearing where the formal rules of evidence applied." *In re Jay H.*, 395 Ill. App. 3d 1063, 1070, 918 N.E.2d 284, 289 (2009).

¶ 77        As illustrated above, a judge presiding over a juvenile abuse or neglect case may conduct several hearings that involve the same parties but address different legal issues, different evidentiary rules, and different burdens of proof. These differences explain the need for the proper application of judicial notice in a parental fitness hearing.

¶ 78        2. *Judicial Notice at Fitness Portion of Parental Termination Proceedings*

¶ 79        A judge presiding over the fitness portion of a parental termination proceeding will often find it necessary to take judicial notice of some portion of the court file. This is so because, at such a hearing, the court is called upon to determine a parent's efforts and progress toward reunification with the minor. To measure that progress, the court will necessarily consider how the case started and what service plan the respondent was required to complete. This information may be reflected in the court's prior orders, its findings of fact, or sworn testimony the court has already heard. This court explained this point more fully in *J.G.*, as follows:

"At an unfitness hearing, the trial court must necessarily take notice of certain facts relating to how the case has reached the point at which termination of parental rights is sought by the State. Thus, the court must know what steps the parent was supposed to have taken in order to achieve reunification with the child and when the clock began to run during which time the parent was required to take these steps." *J.G.*, 298 Ill. App. 3d at 628-29.

¶ 80 Accordingly, judicial notice is usually important and required in order to answer the threshold questions at a parental fitness hearing: "What were the court's orders and what remedial actions was respondent directed to take?" To answer these questions, it is well established that a court may properly consider matters of record in its own proceedings, including its own orders. *Id.* at 627; *A.B.*, 308 Ill. App. 3d at 237.

¶ 81 But the evidence underlying those orders—particularly evidence from the permanency hearings—may not be considered by the trial court at the fitness portion of the termination proceedings. This principle is reflected in section 2-18(6) of the Juvenile Court Act, which specifically permits the court to take judicial notice of evidence and sworn testimony in prior juvenile proceedings involving the same minor, provided that "*the taking of judicial notice would not result in admitting hearsay evidence at a hearing where it would otherwise be prohibited.*" (Emphasis added.) 705 ILCS 405/2-18(6) (West 2020).

¶ 82 For example, when a court is conducting the fitness portion of a termination proceeding, the court may not take judicial notice of a report presented in a permanency hearing because the hearsay statements in the report—although admissible at the permanency hearing— would be inadmissible hearsay at the fitness hearing, because the formal rules of evidence apply at such hearings.

¶ 83　　　　　Accordingly, "wholesale judicial notice of everything that took place prior to the unfitness hearing is unnecessary and inappropriate." *J.G.*, 298 Ill. App. 3d at 629. This concept is of paramount importance because, "[a]bove all, the trial court's decision as to whether a parent is unfit should be based only upon evidence *properly admitted* at the unfitness hearing." (Emphasis added.) *Id.*

¶ 84　　　　　For example, although a trial court presiding over the fitness portion of termination proceedings may take judicial notice of its prior dispositional orders, it may *not* take judicial notice of testimony that was presented at the dispositional hearing. To do so would violate settled Illinois law that the formal rules of evidence apply to the fitness portion of the termination hearing. See *In re M.S.*, 239 Ill. App. 3d 938, 946, 606 N.E.2d 768, 773 (1992) ("[T]he rules of evidence that normally apply in civil cases apply to parental rights termination proceedings."). If a party wishes the court to consider testimony that was previously admitted at the dispositional hearing, the party must call the witness who was the source of that testimony to testify again.

¶ 85　　　　　Taking these principles into account, in *J.G.*, this court delineated the proper procedure to follow when a party asks the trial court to take judicial notice of the court file at a parental fitness hearing:

> "If the State wishes the trial court to take judicial notice of portions of the court file in a particular unfitness proceeding, the State can make a proffer to the court of the material requested to be noticed. Defense counsel should then be allowed an opportunity to object to the State's request. Such a procedure would serve to focus the trial court's attention on only those matters that are admissible under the rules of evidence, as well as make it easier for a reviewing court to determine what the trial court actually relied on in making its decision of unfitness."

*J.G.*, 298 Ill. App. 3d at 629.

¶ 86    In *A.L.*, 409 Ill. App. 3d at 504, this court provided further direction and rationale for this procedure and wrote the following:

> "[W]hen a party requests that the trial court take judicial notice of the prior record at a fitness hearing, the parties as well as the court must be clear as to the scope of the judicial notice requested. This required clarity is important given *** the different rules of evidence that apply—namely, no formal rules of evidence at a dispositional or permanency review hearing, yet those same rules of evidence are strictly enforced at fitness hearings."

¶ 87    Ensuring that only proper judicial notice is taken at the fitness portion of a termination hearing is the responsibility of all of the participants in that hearing, including the trial court, the State, the GAL, and defense counsel. This is so because of the importance of the fundamental liberty interest at stake at such a hearing—namely, the right to be a parent to one's own child. See *In re M.H.*, 196 Ill. 2d 356, 362, 751 N.E.2d 1134, 1139 (2001) (" '[T]he interest of parents in the care, custody and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court.' " (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion))). When a court terminates parental rights, the relationship between parent and child is permanently severed. To the parent, it is as if her child has died. See *J.G.*, 298 Ill. App. 3d at 629 (describing termination of parental rights as "the ultimate sanction of the permanent and irrevocable loss of any rights to his or her child").

¶ 88    Accordingly, all of the participants in the fitness portion of a termination hearing must be vigilant to ensure that (1) only *admissible* evidence is judicially noticed and (2) the record demonstrates with clarity and specificity what evidence was judicially noticed.

¶ 89                    C. Respondent's Claim of Ineffective Assistance

¶ 90         We now reach respondent's claim that she received ineffective assistance of counsel when her attorney failed to object to the GAL's request that the trial court take judicial notice of the court file, which, respondent alleges, resulted in the admission of inadmissible hearsay.

¶ 91                              1. *The Applicable Law*

¶ 92         A parent has the statutory right to the effective assistance of counsel in termination proceedings. *In re Br. M.*, 2021 IL 125969, ¶ 42. Claims of ineffective assistance of counsel are evaluated under the familiar two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 688 (1984). *Br. M.*, 2021 IL 125969, ¶ 42. Under that standard, a parent must show that (1) counsel's performance failed to meet an objective standard of competence and (2) counsel's deficient performance resulted in prejudice to the parent. *In re Ch. W.*, 408 Ill. App. 3d 541, 546, 948 N.E.2d 641, 648 (2011). To satisfy the prejudice prong, the parent must prove a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 547.

¶ 93         A reviewing court "may dispose of an ineffective assistance of counsel claim by proceeding directly to the prejudice prong without addressing counsel's performance." *People v. Hale*, 2013 IL 113140, ¶ 17, 996 N.E.2d 607.

¶ 94                              2. *This Case*

¶ 95         In this case, in the middle of his direct examination of Fasig, the GAL asked the trial court, "Judge, before I forget, I would ask the Court to take judicial notice of the file as part of this." The court responded, "Court will take judicial notice of 19-JA-6." This was the entirety of the exchange regarding judicial notice.

¶ 96         As discussed above (*supra* ¶¶ 85-87), the GAL should have specified what evidence counsel was requesting the trial court to judicially notice. Because the GAL did not so specify, the court should have (1) asked the GAL to do so, (2) designated what portions of the court file it was judicially noticing (if any), and (3) clarified that it was not considering any inadmissible evidence in reaching its decision. When none of that happened, the prosecutor should have alerted the court to the proper procedure and requested that it be followed. And, as a last resort if none of the above occurred, respondent's counsel should have objected to the admission of any inadmissible hearsay through judicial notice.

¶ 97         Regardless, we need not definitely determine whether respondent's counsel's performance in this case was objectively unreasonable because respondent cannot establish that she was prejudiced.

¶ 98         Respondent argues that, if her counsel had objected to the "bulk admission" of the court file, a reasonable likelihood exists that the outcome of the proceeding would have been different. This is so, respondent contends, because "the trial court's decision as to whether a parent is unfit should be based only upon evidence properly admitted at the unfitness hearing." *J.G.*, 298 Ill. App. 3d at 629. Respondent asserts that, in reaching its fitness determination, the trial court relied on respondent's failure to (1) take prescribed medications and (2) address past traumas from her own sexual abuse. Respondent asserts that the court relied on inadmissible hearsay from the permanency hearing reports, integrated assessment, and mental health assessment to reach these findings. Respondent also argues that the State did not subpoena either the authors of these documents or the physician who prescribed psychotropic medications to respondent.

¶ 99         We disagree. The record does not affirmatively establish that the trial court considered any inadmissible evidence in reaching its decision that respondent was unfit.

¶ 100    First, the record contains no indication that the court considered any permanency hearing report or the integrated assessment in reaching its fitness determination. In its ruling, the court did not state that it considered any evidence from those documents, nor did any of the parties refer to any evidence from any permanency report or the integrated assessment in their arguments. The court issued its oral ruling, finding respondent unfit, immediately following the presentation of evidence and referred only to evidence that was presented during the fitness hearing. Moreover, the law presumes that a court sitting without a jury has "relied only upon competent evidence in making its determination." (Internal quotation marks omitted.) *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 37, 6 N.E.2d 399. Respondent has not pointed to any evidence, remark, or ruling that would overcome that presumption.

¶ 101    The trial court did refer to the mental health assessment when it ruled that respondent "did not complete the mental health recommendations, that she did not see the psychologist for medications that she was in need of." However, these remarks are supported by Fasig's testimony at the fitness hearing. Namely, Fasig testified that respondent was required to complete a mental health assessment. Fasig referred respondent for the assessment, but respondent was placed on a waiting list. Because respondent had previously been diagnosed with anxiety, bipolar disorder, and depression, Fasig referred respondent for individual counseling while she waited for the assessment. Respondent completed the mental health assessment, which recommended respondent see a psychiatrist for medication management. Respondent did not complete this follow-up recommendation.

¶ 102    We note respondent raised no hearsay objection to any of Fasig's testimony. Assuming without deciding that some of it may have been hearsay, the law is clear that hearsay admitted without objection can be given its natural probative weight. *People v. Harris*, 2012 IL

App (1st) 100077, ¶ 26, 966 N.E.2d 496; *People v. Banks*, 378 Ill. App. 3d 856, 861, 883 N.E.2d 43, 48 (2007); *People v. Tara*, 367 Ill. App. 3d 479, 486, 867 N.E.2d 961, 969 (2006).

¶ 103    Regarding respondent's failure to progress in counseling, both Brooks and Westlake testified about their knowledge of respondent's history of sexual trauma at the hands of her mother and respondent's inconsistent report of an idyllic childhood. They both explained how this disconnect prevented respondent from making any meaningful progress toward addressing the trauma, which, in turn, prevented any progress toward returning M.D. to her mother's care. Respondent did not object to Brooks's and Westlake's testimony at the fitness hearing.

¶ 104    The record does not indicate that the court considered any evidence beyond this testimony in reaching its conclusion. In fact, the whole of the court's remarks on this topic consisted of the following: "[Respondent is] still not addressing the issues of the past trauma of her own sexual abuse, which DCFS and Hobby Horse both indicate is a severe impediment to her correcting the conditions which were the reason for the removal of the child." Respondent points to no comment by the court that would indicate it considered any inadmissible evidence from the court file in reaching this conclusion.

¶ 105    Because respondent has not established that the trial court considered any inadmissible evidence through judicial notice when finding respondent unfit, she has failed to establish that she was prejudiced by her counsel's failure to object to the GAL's request that the court take judicial notice of "the file." To the contrary, the record establishes that the court relied upon admissible evidence presented at the hearing, which was sufficient to find respondent unfit. Accordingly, respondent's claim of ineffective assistance fails.

¶ 106                                III. CONCLUSION

¶ 107    For the reasons stated, we affirm the trial court's judgment.

¶ 108          Affirmed.

| | |
|---|---|
| **Cite as:** | *In re M.D.*, 2022 IL App (4th) 210288 |
| **Decision Under Review:** | Appeal from the Circuit Court of Brown County, No. 19-JA-6; the Hon. Jerry J. Hooker, Judge, presiding. |
| **Attorneys for Appellant:** | Dustin T. Clark, of Clark & Jones, of Rushville, for appellant. |
| **Attorneys for Appellee:** | Michael Hill, State's Attorney, of Mt. Sterling (Patrick Delfino, David J. Robinson, and Kerri S. Davis, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | Jesse R. Gilsdorf, of Mt. Sterling, guardian *ad litem*. |