NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 240268-U

NO. 4-24-0268

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 5, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* N.P., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
| Petitioner-Appellee, | ) | No. 22JA312 |
| v. | ) | |
| Xavier P., | ) | Honorable |
| Respondent-Appellant). | ) | Francis M. Martinez, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Lannerd and Vancil concurred in the judgment.

**ORDER**

¶ 1    *Held:* The appellate court granted appellate counsel's motion to withdraw and affirmed the trial court's judgment, finding no issue of arguable merit could be raised on appeal.

¶ 2    In November 2023, the State filed a motion to terminate the parental rights of respondent father, Xavier P. (Father), to his minor child, N.P. (born July 24, 2021). The trial court found Father to be an unfit parent pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) and it was in the child's best interest to terminate Father's parental rights. Father appealed.

¶ 3    In April 2024, appellate counsel filed a motion to withdraw as counsel for the consolidated cases and a supporting brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), arguing no meritorious issue could be raised on appeal. For the following reasons, we grant the motion to withdraw and affirm the trial court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5                               A. Initial Procedural History

¶ 6        On July 5, 2022, the State filed a petition for adjudication of wardship alleging N.P. was a neglected and/or abused minor whose environment was injurious to her welfare pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)). The allegations all related to the conduct of Taylor B. (Mother), now deceased. The petition named Father the putative father of N.P. An amended petition, filed July 6, 2022, changed nothing relevant to this appeal.

¶ 7        In September 2022, Mother and Father stipulated N.P. was a neglected minor. The trial court then entered an adjudicatory order based on the first count of the petition, which alleged N.P. was in an environment injurious to her welfare. On November 10, 2022, Father stipulated, because he was incarcerated, he was, at the least, unable to care for, protect, train, educate, supervise, or discipline N.P. The mother also stipulated her unfitness or inability to care for N.P. The court thus entered an order of disposition making N.P. a ward of the court and placing custody with the guardianship administrator of the Illinois Department of Children and Family Services (DCFS).

¶ 8        In September 2023, the trial court adjudicated Father to be N.P.'s father.

¶ 9                          B. The Petition for Termination of Parental Rights

¶ 10       In November 2023, the State filed a petition for termination of parental rights. The motion noted Mother was deceased. As to Father, the petition alleged he was an unfit father because he (1) failed to make reasonable efforts to progress toward the return of the child to the parent during the nine-month periods of September 27, 2022, to June 27, 2023, and January 27, 2023, to October 27, 2023 (see 750 ILCS 50/1(m)(ii) (West 2022)), (2) had been repeatedly

incarcerated as a result of criminal convictions, and his repeated incarcerations had prevented him from discharging his parental responsibilities to the child (see *id* § 1(D)(s)) and (3) was depraved (see *id* § 1(D)(i)).

¶ 11                     C. The Fitness Portion of the Termination Proceedings

¶ 12                              1. *The State's Evidence*

¶ 13        The hearing on the fitness portion of the termination proceedings took place on December 21, 2023. Respondent, who was in the custody of the Illinois Department of Corrections (DOC), was present via Zoom. The trial court, on the State's motion, took notice of, *inter alia*, the existing court record and admitted onto evidence certificates of conviction for Father's felony convictions in three cases: in Winnebago County case No. 22-CF-283, an April 29, 2022, conviction of unlawful possession of a firearm by a felon (720 ILCS 5/24-1.1(a) (West 2022)), a Class 2 felony; in Winnebago County case No. 21-CF-2287, an April 29, 2022, conviction of aggravated domestic battery (720 ILCS 5/12-3.3(a-5) (West 2022)), a Class 2 felony; and in Winnebago County case No. 17-CF-1862, an April 26, 2018 conviction of home invasion (720 ILCS 5/19-6(a)(2) (West 2018)), a Class X felony, which is nonprobationable (730 ILCS 5/5-4.5-25(d) (West 2018)).

¶ 14        Charo Garlitz testified she was a caseworker with the Youth Service Bureau (YSB) and had been assigned to N.P.'s case from the outset. She recognized the service plans, and the trial court admitted them. The only requirement for Father was his participation in the integrated assessment. He completed a written integrated assessment in September 2023. Garlitz had sent him the form "at least twice" in 2022, and Father did not complete it then. He participated in services available to him through the DOC. Further, N.P.'s case came into care based solely on Mother's conduct.

¶ 15        N.P. was two years old when the hearing occurred. Father had contact with her before he was incarcerated. Garlitz had recently succeeded in arranging in-person visits for N.P. with Father at Sheridan Correctional Center of the DOC. N.P. was slow to "warm up" to Father, but he was patient with her. However, Garlitz believed N.P. did not know who Father was. Father's projected release date was November 2024.

¶ 16                              2. *Respondent's Evidence*

¶ 17        Respondent testified he was currently incarcerated, serving his sentence for unlawful possession of a firearm by a felon. He expected his November 2024 release date to be moved forward based on his participation in a drug treatment program. He had participated in a program to teach men better parenting skills. He had also participated in a church-based parenting program. He had had trouble receiving forms from the YSB. DCFS succeeded in bringing N.P. to visit him in prison, but earlier attempts to have N.P. visit him had failed because the adults who accompanied her were not acceptable to the DOC. The first two visits he had were "kind of rocky," but the third and last visit went very well. He agreed he had been incarcerated, either in jail or prison, since N.P. was seven months old. He further agreed he had been arrested for domestic violence against Mother.

¶ 18        Father believed he had grown up since his last arrest and had become a different person. He expected to go back to his old job. He stated he had a "stable home" with his sister to go to when the DOC released him.

¶ 19        In arguing against the trial court's finding that Father's repeated incarcerations had prevented him from discharging his parental responsibilities to the child, Father's counsel noted Father had been incarcerated only once during N.P.'s lifetime. However, he further noted Father had been incarcerated in 2017, presumably when he was serving his sentence for home invasion.

¶ 20                    3. *The Trial Court's Finding of Unfitness*

¶ 21          At a January 31, 2024, hearing, the trial court found Father unfit. It recognized the State's burden was to prove at least one count by clear and convincing evidence. The court stated it had needed "to wrestle with" the first count, which alleged lack of reasonable progress. It concluded a service plan should have been created for father regardless of the availability of an integrated assessment, as, without a service plan, it lacked a benchmark for Father's progress. It thus concluded the State had failed to offer sufficient evidence of Father's lack of progress. Concerning the second count, the court noted Father had been incarcerated for approximately three-fourths of N.P.'s life. Father's incarceration had thus "effectively prevented him from providing the financial, physical, and emotional support that [N.P.] is entitled to." Concerning the third count, the court found defendant's three felony convictions, two of which were within the last five years, triggered a statutory presumption of depravity. It further held Father's testimony about his participation in services was insufficient to overcome the presumption. It noted defendant's convictions were for "serious crimes of violence," including aggravated battery and home invasion and stated the "programs simply do not rise to the level where they would indicate a rehabilitation."

¶ 22          D. The Best-Interest Portion of the Termination Proceedings

¶ 23                    1. *The State's Evidence*

¶ 24          The State recalled Garlitz to testify at the best-interest portion of the termination proceeding. She said N.P. had been in the current placement for "the majority of her life." The couple with which N.P. was placed—an aunt and uncle of her half siblings—was the only family placement willing to take in both N.P. and her half siblings. They had hoped the children would return to Mother; however, after Mother died, they affirmed their willingness to adopt all three

children. They had experienced harassment from both the maternal and paternal grandmothers, and Father's sister, all of whom favored placements involving one or two of the children but not all three.

¶ 25        Garlitz believed N.P. and her half siblings were integrated into the family of the couple with whom she was placed. In her opinion, N.P. felt secure in the placement and felt loved and valued. N.P. understood her relationship to Mother but did not really understand her relationship to Father. N.P. had visits with Father's mother once a month. Garlitz believed the couple would encourage a relationship between N.P. and Father if his presence was deemed appropriate. Garlitz believed N.P. was too young to understand or articulate her preferences regarding her placement.

¶ 26                            2. *Father's Evidence*

¶ 27        Father testified he spoke to N.P. once or twice a week by phone. He believed she had become familiar with those calls. He believed his most recent in-person visit with N.P. showed they could have a good relationship. N.P. called Father "Daddy." Father further testified the credit he would receive against his sentence would mean the DOC would release him as early as the end of June 2024.

¶ 28                        3. *The Guardian* Ad Litem's *Evidence*

¶ 29        The guardian *ad litem* (GAL) proffered he had observed N.P. in her placement many times. She and her two half-sisters had "a very close-knit relationship," and she was very attached to them. She called the couple with whom she was placed "Aunt Jackie" and "Uncle Sell." The GAL believed the couple would allow N.P. to develop a relationship with Father. In his opinion, it was in N.P.'s best interest to terminate Father's parental rights and thus allow the couple to adopt N.P.

¶ 30                    4. *The Trial Court's Best-Interest Ruling*

¶ 31        The trial court ruled the preponderance of the evidence showed termination of Father's parental rights was in N.P.'s best interest. It found the evidence from Garlitz and the GAL addressed the statutory best-interest factors.

¶ 32        Addressing Father's desire to retain his rights, the trial court noted permanency was the "overriding concern" in the proceedings. Father's release date was five months away at best, and then Father would have to comply with a new service plan "certainly contain[ing] extensive service requirements." The court estimated the domestic violence program Father would be expected to complete would take six months. Thus, if the court were to consider delaying the termination of Father's rights, permanency would be delayed for at least a year. It deemed such a delay to be "not something that the Juvenile Court Act approves of."

¶ 33        This appeal followed.

¶ 34                              II. ANALYSIS

¶ 35        On appeal, appellate counsel seeks to withdraw contending she cannot raise any arguments of potential merit.

¶ 36        The procedure for appellate counsel to withdraw set forth in *Anders* applies to findings of parental unfitness and termination of parental rights. *In re S.M.*, 314 Ill. App. 3d 682, 685, 732 N.E.2d 140, 143 (2000). According to this procedure, counsel's request to withdraw must "be accompanied by a brief referring to anything in the record that might arguably support the appeal." *Anders*, 386 U.S. at 744. Counsel must "(a) sketch the argument in support of the issues that could conceivably be raised on appeal, and then (b) explain why he believes the arguments are frivolous." *S.M.*, 314 Ill. App. 3d at 685. Counsel must then conclude the case presents no viable grounds for appeal. *Id.* In doing so, counsel should review both the unfitness finding and

the best-interest determination and indicate in the brief she has done so. *Id*. at 685-86.

¶ 37 Here, counsel states she has reviewed the record on appeal, and her motion demonstrates she has reviewed the report of the termination proceeding. The record indicates counsel sent a copy of her motion and accompanying memorandum of law to respondent by mail. Respondent has not filed a response. Counsel addresses two possible issues for review: (1) whether it was arguable both the bases on which the trial court found Father unfit were against the manifest weight of the evidence and (2) whether it was arguably contrary to N.P.'s best interest to be adopted by a 64-year-old. Appellate counsel has explained, with argument and citation to authority, why she deems each of these issues lacks merit. We address each argument in turn and ultimately agree with counsel's conclusion there are no issues of arguable merit to be raised on appeal.

¶ 38 A. Unfitness Finding

¶ 39 1. *Applicable Law*

¶ 40 A determination of parental unfitness involves factual findings and credibility determinations which the trial court is in the best position to make because "the trial court's opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. "A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48, 187 N.E.3d 763. "A trial court's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.) *In re N.B.*, 2019 IL App (2d) 180797, ¶ 30, 125 N.E.3d 444.

¶ 41 The State must prove unfitness as defined in section 1(D) of the Adoption Act (750

ILCS 50/1(D) (West 2022)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939, ¶ 28, 115 N.E.3d 102. We can affirm a finding of unfitness if clear and convincing evidence exists to support a single ground for unfitness the State has alleged. See *M.I.*, 2016 IL 120232, ¶ 43, 77 N.E.3d 69 (a trial court can properly terminate a parent's right if a single alleged ground of unfitness is supported by clear and convincing evidence).

¶ 42        Section 1(D)(s) of the Adoption Act, defines a parent as unfit due to his or her incarceration if:

> "The child is in the temporary custody or guardianship of [DCFS], the parent is incarcerated at the time the petition or motion for termination of parental rights is filed, the parent has been repeatedly incarcerated as a result of criminal convictions, and the parent's repeated incarceration has prevented the parent from discharging his or her parental responsibilities for the child." 750 ILCS 50/1(D)(s) (West 2022).

To show a parent is unfit under section 1(D)(s) of the Adoption Act, "only one incarceration is necessary for a finding of unfitness *** if the [trial] court finds the parent was prevented from discharging his responsibilities." *In re E.C.*, 337 Ill. App. 3d 391, 399, 786 N.E. 2d 590, 597 (2003) (citing *In re D.D.,* 196 Ill. 2d 405, 420-22, 752 N.E.2d 1112, 1120-1122 (2001)). When making an unfitness determination under section 1(D)(s) "courts may consider the overall impact of the parent's incarceration, such as the diminished capacity to provide financial, physical, and emotional support for the child." *Id* at 400.

¶ 43                    2. *This Case*

¶ 44        Here, the evidence showed, when the State filed its motion for termination of parental rights and at the time of the termination hearings, Father was incarcerated due to his 2022

conviction of unlawful possession of a weapon by a felon. He had been incarcerated since N.P. was seven months old. Moreover, he had been convicted of the nonprobationable offense of home invasion in a 2017 case. Thus, Father's current incarceration had prevented him from discharging his responsibilities as a parent for the greater part of N.P.'s life. Further, his prior incarceration for home invasion suggested defendant had been incarcerated a significant part of his adult life. (The certificates of conviction the trial court admitted into evidence at the fitness hearing showed Father was born in 1996.) Therefore, it would be frivolous to argue the court's determination Father was unfit due to his incarceration was against the manifest weight of the evidence.

¶ 45                                    B. Best-Interest Determination

¶ 46                                    1. *Applicable Law*

¶ 47            At the best-interest stage of termination proceedings, the State bears the burden of proving termination of parental rights is in the child's best interest by a preponderance of the evidence. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71, 145 N.E.3d 605. In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors, which are derived from section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)):

> "(1) the child's physical safety and welfare; (2) the development of the child's
> identity; (3) the child's familial, cultural[,] and religious background and ties;
> (4) the child's sense of attachments, including love, security, familiarity, continuity
> of affection, and the least disruptive placement alternative; (5) the child's wishes
> and long-term goals; (6) the child's community ties; (7) the child's need for
> permanence, including the need for stability and continuity of relationships with
> parent figures and siblings; (8) the uniqueness of every family and child; (9) the

risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32, 147 N.E.3d 953; see 705 ILCS 405/1-3(4.05) (West 2022).

¶ 48    In contrast to fitness hearings, at which the Illinois Rules of Evidence apply, "at the best interest portion of the termination hearing *** the trial court may consider 'all evidence helpful *** in determining the questions before the court *** even though that evidence would not be admissible in a hearing where the formal rules of evidence applied.' " *In re M.D.*, 2022 IL App (4th) 210288, ¶ 76, 193 N.E.3d 933 (quoting *In re Jay. H.*, 395 Ill. App. 3d 1063, 1070, 918 N.E.2d 284, 289 (2009)).

¶ 49    A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in a superior position to view the witnesses and judge their credibility. *C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision regarding a child's best interests *** unless it is against the manifest weight of the evidence." *Id.* ¶ 68. A best-interest determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *Id.*

¶ 50                              2. *This Case*

¶ 51    Here, the evidence showed N.P. was in a placement with her half sisters, to whom she was deeply attached. She, her half sisters, and the couple with whom she was placed functioned well as a family. By contrast, N.P. was barely familiar with Father. Moreover, because Father was incarcerated and, upon release, would need to participate in programs to establish he was an acceptable custodial parent, declining to terminate Father's rights would delay permanency for approximately a year in the best case. Thus, it is *not* clear terminating Father's rights was contrary to N.P.'s best interest, and it therefore would be frivolous to argue the trial court's best interest

determination was contrary to the manifest weight of the evidence.

¶ 52                                III. CONCLUSION

¶ 53          For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 54          Affirmed.