2025 IL App (2d) 250184-U
No. 2-25-0184
Order filed September 22, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re D.S., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Kendall County. |
| | ) | |
| | ) | No. 23-JA-41 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Jody Gleason, |
| Appellee v. Jessica F., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Justices McLaren and Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's finding that the State proved by clear and convincing evidence that respondent was unfit for failure to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare was not against the manifest weight of the evidence. As such, and because respondent does not challenge the best-interest prong of the analysis, the trial court's decision to terminate respondent's parental rights is affirmed. Further, respondent's counsel was not ineffective for failing to present cumulative evidence during the unfitness portion of trial.

¶ 2    Respondent, Jessica F., appeals from an order of the circuit court of Kendall County finding her unfit on two counts of a petition to terminate her parental rights. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    Respondent is the biological mother of D.S., who was born on January 15, 2020.[1] Her parental rights were terminated on April 4, 2025. The parental rights of D.S.'s biological father were terminated in the same proceeding, but are not at issue in this appeal.

¶ 5                    A.   THE NEGLECT PETITION

¶ 6    The case originated when a report was initiated with DCFS stating that on May 9, 2023, D.S came to school with bruises on his leg and a scab on his elbow. On May 10, 2023, D.S. appeared at school with scratches on his forehead and on his arm. When asked what happened, D.S., who has a developmental delay and is nonverbal, would respond "hurt." Personnel from D.S.'s school informed DCFS that respondent suffers from mental health issues and had not been doing well. Respondent was living in hotels and calling gas companies because she believed there to be gas leaks. D.S.'s bus driver reported that respondent had been absent from picking D.S. up without explanation. Additionally, respondent took a drug test and tested positive for cocaine.

¶ 7    On May 17, 2023, the State filed a petition to adjudicate D.S. a neglected minor on the ground that his environment is injurious to his welfare. Following a hearing on May 18, 2023, the circuit court found probable cause and immediate and urgent necessity to remove the minor from the home and placed the minor in the temporary care of the Illinois Department of Children and Family Services (DCFS). The court's temporary custody order indicates that respondent received notice of the hearing but was not present because she was in the hospital. D.S. was placed in the care of his maternal grandmother and step-grandfather. The order stated that respondent has mental health issues and was in the hospital at the time, but was unable to be evaluated due to her condition.

---

[1]Respondent is also the mother of C.S., born February 4, 2008. Respondent's parental rights with regard to C.S. are not at issue in this appeal.

¶ 8     During an appearance on May 26, 2023, the trial court appointed counsel for respondent. At that time, the trial court granted respondent supervised visitation at the discretion of DCFS, but did not otherwise amend the temporary custody order.

¶ 9     On August 3, 2023, respondent completed an integrated assessment. Of note, respondent had previously been arrested for battery, domestic battery, and bodily harm. These charges resulted in respondent having an order of protection placed against her, although she was not convicted of any of the charges. Additionally, respondent described having an extensive mental health and treatment history, including depressive symptoms, anxiety, panic attacks, and psychiatric holds. Respondent indicated that she was prescribed Zoloft at age 12, but was not currently taking the medication. Further, she had a history of alcohol abuse and cocaine use. Based on the integrated assessment, respondent was recommended to: participate in medication monitoring; participate in individual psychotherapy; abstain from alcohol and substance use; participate in a substance abuse assessment; participate in random drug screens; participate in a domestic violence program; participate in parent education and parent coaching; participate in family therapy; obtain and maintain  safe and appropriate residential stability; and participate in supervised visitation and interactive parenting.

¶ 10    On February 13, 2024, the trial court entered an order adjudicating D.S. neglected in that he was in an environment injurious to his welfare. See 705 ILCS 405/2-3(1)(b) (West 2024). The adjudication order reflects that this finding was based upon respondent leaving D.S. without a plan for his care, failing to pick him up from the school bus, and having mental health issues caused D.S. to be left alone and in danger. Respondent was admonished to cooperate with DCFS and the terms of any service plan.

¶ 11                    B.  THE PERMANENCY REVIEWS

¶ 12    On March 26, 2024, a dispositional order was entered finding respondent, for reasons other than financial circumstances alone, unfit and unable to care for, protect, train, educate, supervise, or discipline D.S. The court cited respondent's ongoing substance abuse and mental health issues. The court noted in the order that respondent "had to be hospitalized due to her substance abuse [and] mental health issues" and that she left D.S. in the custody of someone lacking the legal authority to care for him. In the dispositional order, the court found that the service plan (which was dated November 22, 2023) was appropriate, the services which had been delivered and were to be delivered were appropriate.

¶ 13    The November 22, 2023, service plan noted that although respondent was not cooperating with agency recommendations, she had completed the integrated assessment. It further noted that prior court dates had to be rescheduled because respondent was in the hospital on suicide watch.[2] DCFS indicated that respondent was referred for individual therapy. However, she was not mentally stable enough to begin therapy, as she needed to become medication compliant and to stop using substances. While respondent did attend a psychiatric evaluation, DCFS did not deem it adequate because the doctor did not prescribe any medication or review the medications respondent had previously been prescribed. Additionally, DCFS stated that the evaluation was not comprehensive as the doctor only based his summarization on what respondent told him and "missed a lot of information by not obtaining *** background information." The reporter indicated that DCFS wanted a second evaluation completed, but respondent's hospitalizations hampered the referral. Further, respondent continued to abuse substances and would not confirm her sobriety.

_____

[2]A service plan dated February 6, 2025, indicates that respondent attended a January 23, 2024, court date appearing "unhealthy, disheveled, and intoxicated." Her paramour drove her to a hospital for 72-hour detox and treatment.

However, respondent did complete a substance abuse evaluation. She was not compliant with the recommendations from that evaluation. At the time of the family service plan, respondent was not in communication with her caseworker, but did attend court dates when not hospitalized. Finally, the family service plan noted that respondent's visitation with D.S. had been inconsistent and that she had cancelled her last three visits. Moreover, respondent was unable to participate in parent education classes at the time, as parenting classes had been deemed inappropriate.

¶ 14 On May 7, 2024, CASA filed a report with the trial court. The CASA report indicated that respondent had begun to engage in services. She was attending individual therapy, parenting classes, substance abuse classes, and was compliant with medications. Since the February 13, 2024, adjudicatory hearing, respondent had been engaged in drug and alcohol tests and those tests were negative for substances.

¶ 15 Also on May 7, 2024, the trial court held a permanency review hearing. At the hearing, the trial court determined that it could not determine whether respondent had made reasonable or substantial progress towards reunification because the case "just went to disposition" on March 26, 2024. The trial court found that respondent had made reasonable efforts toward reunification in that time period.

¶ 16 On November 6, 2024, the Youth Service Bureau (YSB) filed a report with the trial court. The YSB report noted that respondent had withdrawn herself from all communication with her caseworkers and service providers following a child and family team meeting on September 20, 2024. The reporter noted that respondent and her boyfriend were living in their car. Further, respondent had been discharged from her individual substance abuse treatment due to her failure to attend or communicate the reasons for her absence. Likewise, it was reported that respondent had been discharged from her outpatient mental health program on October 15, 2024, which also

discharged her from psychiatric services. There had been no confirmation that respondent was compliant with her medications since September 29, 2024. Respondent did, however, complete domestic violence counseling and a parenting class.

¶ 17    On November 14, 2024, the court held a permanency review hearing. Respondent failed to appear, but was represented by her attorney. Following the hearing, the court entered an order finding that respondent had not made reasonable efforts or reasonable progress towards the goal of reunification. The court further ordered that respondent cooperate with DCFS and do all the services required of her.

¶ 18    On February 6, 2025, a CASA report was filed in the trial court. The report noted that the case passed legal screening on January 22, 2025, and that respondent had had no contact with CASA. On February 7, 2025, YSB filed a report and service plan in the trial court. The report noted that DCFS held a child and family team meeting on September 20, 2024. After the meeting, respondent "disappeared" for approximately three months, ceasing all contact with her service providers. Respondent's caseworker attempted to locate respondent by contacting local hospitals, her service providers, all associated phone numbers, and known family members, but was unable to ascertain respondent's whereabouts during that time. On January 16, 2025, respondent resumed substance abuse treatment at the advisement of her caseworker. According to the report, respondent was not yet re-engaged in mental health counseling and was not compliant with her medications. However, she was scheduled to resume individual counseling on February 5, 2025. The plan noted that respondent completed parenting education classes but did not understand how abandoning a child has long term effects on a child's self-esteem or self-worth. The reporter stated that respondent demonstrated that she can complete tasks, but failed to apply what she had learned to her parenting. Further, respondent did not visit with D.S. for approximately four months. She

resumed visitation with D.S. on January 8, 2025. Additionally, although respondent had obtained employment, she was still living in her car and in motels.

¶ 19    After a hearing on February 11, 2025, the trial court entered an order finding that the appropriate permanency goal was substitute care pending determination of termination of parental rights. As a basis for this finding, the trial court stated that respondent's whereabouts were unknown for a period of three months, she had only recently reengaged in services, and there were uncompleted services. The court found that respondent had not made reasonable efforts or reasonable progress towards the goal of reunification.

¶ 20                                C.  THE TERMINATION PROCEEDINGS

¶ 21    On February 11, 2025, the State filed a "Motion" to terminate respondent's parental rights on three distinct grounds: (1) a failure to maintain a reasonable degree of interest, concern or responsibility as to the D.S.'s welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) a failure to make reasonable efforts to correct the conditions which were the basis for the removal of D.S. within 9 months after adjudication (750 ILCS 50/1(D)(m)(i) (West 2024)); and (3) a failure to make reasonable progress toward the return of D.S. within 9 months after adjudication (750 ILCS 50/1(D)(m)(ii) (West 2024)). As to reasonable efforts, the petition referenced the time period from May 7, 2024, to February 7, 2025. As to reasonable progress, the petition referenced the time periods from February 14, 2024[3], to November 14, 2024, and May 7, 2024, to February 7, 2025.

¶ 22                                1. Unfitness Hearing

¶ 23    The unfitness phase of the proceedings to terminate respondent's parental rights commenced on April 4, 2025.

_____

[3]The State's petition originally stated February 14, 2014. This scrivener's error was later corrected at the unfitness hearing.

¶ 24    The State's first witness was Courtney Jones, a caseworker with YSB. Jones testified that she had been D.S.'s caseworker since the child came into care in May 2023. Jones explained that D.S. came into care for neglect, because, instead of picking D.S. up from school, respondent was staying in a hotel and abusing substances. After D.S. came into care, respondent completed an integrated assessment on August 3, 2023. Jones testified that based on the results of the integrated assessment, respondent was required to attend a substance abuse evaluation, substance abuse classes, random drug drops, mental health services, individual therapy, parenting classes, parent coaching, and domestic violence classes. To the best of Jones's knowledge, respondent was aware of and understood the services she needed to complete.

¶ 25    Jones further testified that respondent's first service plan was completed before adjudication and the disposition of the case. The first service plan was dated November 22, 2023. Jones explained that respondent was given the goal to find stable housing because respondent had been "living out of a truck with her boyfriend" and the agency wanted a stable living environment for D.S. From the time of adjudication on February 13, 2024, to the first permanency hearing on May 7, 2024, Jones did not recall any reasonable efforts or substantial progress made by respondent.

¶ 26    Jones confirmed that the next two six-month periods were November 2023 to May 2024, and May 2024 to November 2024. Jones testified that in the period from May 2024 to November 2024, respondent started psychiatric services so that she could obtain medication and become medication compliant. Respondent also began participating in individual therapy and completed domestic violence services. Regarding psychiatric services, Jones testified that respondent was discharged because she stopped attending. She was likewise discharged from substance abuse counseling for the same reason. Further, respondent never attended parent coaching due to "the

stop and delaying [of] services" on respondent's part. Jones testified that from May 2024 to November 2024, respondent did not have consistent contact with D.S. because the contact "dropped off" around September or October, after a child and family team meeting. Visitation did not resume until January 2025. During the time that contact with respondent had "dropped off," Jones did not know where respondent was. Jones unsuccessfully reached out to respondent at least two to three times in a month. Jones finally got in contact with respondent in January 2025, after another attempt to reach out. When Jones got in contact with respondent, she asked if respondent planned to reengage in services. Respondent did not reach out to Jones during that time and did not ask about D.S. After Jones contacted respondent about re-engaging in services, respondent contacted Mutual Ground and set up substance abuse services again.

¶ 27    In her testimony, Jones described respondent's engagement in services from the time of adjudication until trial as "off again, on again" because there "just hasn't been consistent involvement in her kid's life." Jones did not believe this behavior to be healthy for D.S.

¶ 28    Jones did not believe there were obstacles that hindered respondent from engaging in services. She testified that respondent lived out of her boyfriend's truck. However, DCFS assisted respondent by providing her with gas cards so she could get back and forth to services. Respondent paid for her services such as therapy, but Jones testified that DCFS could pay for services that respondent could not afford. At the time of trial, Jones testified that respondent had not completed her mental health therapy, had not completed her substance abuse treatments, missed many drug tests, and was not able to complete family counseling because it was never deemed appropriate. Respondent never had unsupervised contact with D.S.

¶ 29    On cross-examination, Jones testified that the end point of mental health services includes completing an assessment and staying compliant with medications. At the time of trial, Jones was

not aware whether respondent was medication compliant. She also testified that respondent texted her once in the Christmas season of 2024 to inquire about dropping off gifts for D.S. Additionally, Jones confirmed that at the first permanency hearing, respondent was assessed as having made reasonable efforts.

¶ 30    On redirect, Jones testified that D.S. had been in care for about 22 months, and at the time of trial, she did not believe that D.S. was any closer to being returned home than at the time he was removed from respondent's care. She testified that the conditions that existed at the time D.S. was taken into care still existed because respondent had not completed the services required of her.

¶ 31    Respondent was then called by her attorney to testify. She stated that the original services required by DCFS were communicated to her. These services included parenting classes, but until recently she did not believe that parent coaching was required. Respondent also recalled that she was to complete a mental health assessment and treatment and also attend domestic violence classes. She recalled seeing family counseling in the DCFS reports but did not talk about it with her caseworker.

¶ 32    Respondent further testified that D.S. received speech and occupational therapy. She would follow up on his progress with DCFS and made sure he was receiving those resources in school. She did not ask to attend his therapy sessions, however, as she did not think she was welcome or entitled to do so.

¶ 33    Additionally, respondent testified that she had been receiving mental health services. She had a phone appointment with a psychiatrist. After an assessment, the doctor did not recommend any medication. The psychiatrist recommended therapy, but respondent did not attend until after she was reassessed by Mutual Ground. Respondent testified that she received all of her mental health treatment through Mutual Ground. She stated that she was taking her medications.

¶ 34    With respect to the months that respondent had no contact with DCFS and stopped engaging in her services, respondent testified that she had been ill. She stated that she had several UTIs and sepsis, causing her to miss appointments and a court date. She was unsure of how long these illnesses kept her from engaging in services. When asked if illness was what kept her from engaging with DCFS and visits with D.S., respondent clarified that it was in part illness "and just being very discouraged after the last family meeting." She explained that she became discouraged when she felt that she had completed everything asked of her through Mutual Ground, but DCFS told her that completing services "wasn't just about checking boxes." Respondent had inquired about housing assistance because she had been working, "but it wasn't enough to try to get an apartment." Respondent opined that her housing situation was the only thing keeping her from being able to get D.S. back. Further, she stated that even when contact with DCFS had lapsed, she was still taking her medications. She had been sober since January 2024.

¶ 35    On cross-examination, respondent testified that she had completed parenting classes but was unaware that she had to complete parent coaching. She explained that DCFS reports indicated that she needed to make more progress with individual therapy before starting family counseling. However, she believed that family counseling did not apply to D.S., only her other son. Respondent testified that she was unsuccessfully discharged from mental health services after missing a month of weekly therapy sessions. She called Mutual Ground to reinstate services in November or December, but could not get another appointment until January. Respondent confirmed that from September 19, 2024, until January 8, 2025, she had no contact with D.S. Respondent also testified that she was aware she could ask DCFS for assistance if something hindered her from completing services. She had, for example, received gas cards from DCFS. Respondent stated that she had never missed a visit with D.S. "because of gas." Respondent indicated that although she had been

inconsistent with services, she is "trying now" and just "need[s] a little more time" to complete her services.

¶ 36    Throughout the testimony of witnesses, the State additionally submitted several exhibits, including multiple client service plans, certified records and reports from various agencies, and an integrated assessment. In addition, the State asked the court to take judicial notice of various documents, including the adjudicatory orders, the dispositional orders, and the permanency review orders. Proofs were then closed.

¶ 37    On April 4, 2025, the court rendered its decision, finding that the State met its burden of proving respondent unfit on count 2 (reasonable efforts) and count 3 (reasonable progress) in the petition for termination of parental rights. In issuing its oral ruling, the trial court noted that during the first service plan, respondent made reasonable efforts, but after that, she never made reasonable efforts or reasonable progress. Respondent had completed a parenting program, but she did not finish mental health treatment, did not provide proof of her compliance with medications, did not finish substance abuse treatment, and did not do parent coaching classes. She also had not yet found a stable living environment. The trial court asserted that "really everything broke down about the middle of September [2024]." Respondent's "testimony was that she got sick," but to the trial court, "the most important thing that she said *** was that it was discouraging." It continued, stating, "unfortunately, she got discouraged, and she didn't finish any of her services, other than those two that had been completed before that, and really dropped off the face of the earth until she resurfaced sometime in December to send a text message, and then in January to see the child."

¶ 38    Upon finding respondent unfit, the court heard the best-interest phase of the termination proceedings. The trial court found it in the best interest of D.S. to terminate respondent's parental rights. This appeal followed.

¶ 39                                II. ANALYSIS

¶ 40    On appeal, respondent argues that the trial court erred in terminating her parental rights and that she received ineffective assistance of counsel. With respect to her claim that the trial court improperly granted the State's petition, respondent argues that the trial court's findings were against the manifest weight of the evidence when it found that respondent failed (1) to make reasonable efforts to correct the conditions that were the basis for the removal of D.S. in any 9-month period after the adjudication of neglect; and (2) to make reasonable progress towards the return of D.S. within any 9-month period after the adjudication of neglect.

¶ 41    At the outset, we note that respondent argues that her mental health issues were improperly characterized by DCFS. This, she asserts, caused the trial court to take D.S. into care and use this mischaracterization of her mental health in developing her service plan. The State contends that this court lacks jurisdiction over respondent's complaints about specific mental health issues, as those arguments are an attempt to appeal the contents of the integrated assessment and the service plans. As such, any arguments regarding the integrated assessment or the service plans should have been appealed upon the entry of the dispositional order.

¶ 42    Dispositional orders are regarded as final and appealable as of right. *In re Leona W.*, 228 Ill. 2d 439, 456 (2008). Appeals from final judgments entered in proceedings under the Juvenile Court Act are governed the rules applicable to civil cases. Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001). Supreme Court Rule 301 pertains to appeals from final judgments. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994). Where an appeal is appropriate under Rule 301, the notice of appeal must be filed within

30 days after the entry of the final judgment from which the appeal is being taken. Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017).

¶ 43    Here, D.S. was brought into care on May 18, 2023, following a report that respondent suffered from mental health issues and had been absent from picking up D.S. from school without explanation.  Respondent completed an integrated assessment on August 3, 2023. Based on the integrated assessment, she was recommended to: participate in medication monitoring; participate in individual psychotherapy; abstain from alcohol and substance use; participate in a substance abuse assessment; participate in random drug screens; participate in a domestic violence program; participate in parent education and parent coaching; participate in family therapy; obtain and maintain safe and appropriate residential stability; and participate in supervised visitation and interactive parenting and parent coaching. The order adjudicating D.S. as neglected was entered on February 13, 2024, finding, among other things, that respondent failed to pick up D.S. from the school bus and that respondent's mental health issues caused D.S. to be left alone and in danger.

¶ 44    On March 26, 2024, the dispositional order was entered, finding respondent, for reasons other than financial circumstances alone, unfit and unable to care for, protect, train, educate, supervise, or discipline D.S. The court cited respondent's ongoing substance abuse and mental health issues. The court noted in the order that respondent "had to be hospitalized due to her substance abuse [and] mental health issues" and that she left D.S. in the custody of someone without legal authority to care for him. In the dispositional order, the court found that the service plan was appropriate and that the services which had been delivered and were to be delivered were appropriate.

¶ 45    The dispositional order encompassed the services required of respondent following her integrated assessment. If respondent wished to challenge the services required of her or the finding

of neglect, she should have appealed within 30 days of the entry of the dispositional order. Any error pertaining to the dispositional order has therefore been forfeited, and this court has no jurisdiction to go back and reconsider whether it was proper. See *In re Leona W.*, 228 Ill. 2d at 457. Accordingly, we will not address respondent's arguments regarding whether the trial court properly considered information in the integrated assessment. Thus, we will only address respondent's arguments to the effect that she discusses the efforts and progress she made to complete her service plan as it relates to mental health treatment and individual therapy.

¶ 46   Turning to respondent's arguments that the trial court erred in finding her unfit, we further note that respondent does not distinguish her arguments regarding reasonable efforts and progress. Rather, she lists a series of reasons that the trial court erred, and seems to argue that these points demonstrate both the argument that the trial court erred in finding that respondent failed to make reasonable efforts to correct the conditions that were the basis for the removal of D.S. in any 9-month period after the adjudication of neglect and the argument that it erred in finding that she failed to make reasonable progress towards the return of D.S. within any 9-month period after the adjudication of neglect. It is well settled that "[W]hen parental rights are terminated based upon clear and convincing evidence of a single ground of unfitness, the reviewing court need not consider additional grounds for unfitness cited by the trial court." *In re Tiffany M.*, 353 Ill. App. 3d 883, 891 (2004) (citing *In re D.D.,* 196 Ill. 2d 405, 433 (2001)). Hence, if we affirm the trial court's decision on one ground, we need not consider any other grounds. Accordingly, we address whether respondent made reasonable efforts to correct the conditions that were the basis for the removal of D.S. in any 9-month period after the adjudication of neglect.

¶ 47   The Juvenile Court Act (705 ILCS 405/1-1 et seq. (West 2024)) sets forth a two-stage process for the involuntary termination of parental rights. *In re Keyon R.*, 2017 IL App (2d)

160657, ¶ 16. Initially, the State has the burden of proving by clear and convincing evidence that the parent is unfit under any single ground set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). See 705 ILCS 405/2-29(2), (4) (West 2024); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights is in the child's best interest. See 705 ILCS 405/2-29(2) (West 2024); *In re D.T.*, 212 Ill. 2d 347, 367 (2004). On appeal, this court will not disturb a trial court's finding with respect to parental unfitness or a child's best interest unless it is against the manifest weight of the evidence. *In re N.B.*, 2019 IL App (2d) 180797, ¶¶ 30, 43. A decision is against the manifest weight of the evidence "only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 48     The State's petition for termination of parental rights alleged that respondent was unfit pursuant to section 1(D)(b)(m)(i) of the Adoption Act. That section provides that a parent may be found unfit for failure "to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1D(b)(m)(i) (West 2024). "Reasonable effort is a subjective standard, focusing on the amount of effort that is reasonable for the particular parent whose rights are at stake." *In re J.A.*, 316 Ill. App. 3d 553, 565 (2000). Reasonable efforts relate to the goal of correcting conditions that were the basis of removing the child from the parent. *Id*.

¶ 49     As evidence that she did make reasonable efforts, respondent argues that she completed a psychiatric evaluation, was compliant with medication, completed a substance abuse evaluation and engaged in substance abuse treatment, remained sober, found employment, and attempted to find housing. Respondent also argues that her behavior has not "detrimentally impacted" her

children and that she should not have had her parental rights terminated because she was "in transition."

¶ 50　　Respondent's service plans indicate that D.S. was brought into care because respondent did not pick him up from school, left him with family members without a plan, and was consuming drugs and alcohol. The integrated assessment and service plans also clearly indicate that, without making a specific diagnosis, respondent had mental health issues in addition to her substance abuse issues. She was required to submit to a psychiatric evaluation, a substance abuse evaluation, submit to random drug drops, participate in a domestic violence program, engage in supervised visits with D.S., participate in parent education and parent coaching, and participate in family therapy.

¶ 51　　The evidence supports the trial court's finding that in the 9-month period from May 7, 2024, to February 7, 2025, petitioner did not make reasonable efforts to correct the conditions that were the basis for removal. During this period, by respondent's own testimony, she stopped engaging in services after becoming discouraged. While she had been engaging in individual therapy and substance abuse counseling prior to the parent and family meeting in September 2024, she stopped engaging in services thereafter. She was discharged from substance abuse counseling and individual therapy in October 2024 after missing a month's worth of weekly appointments. She did not reengage in services until three months later. During that time, she also did not visit D.S. She had no contact with her caseworker, and her whereabouts were unknown. Respondent testified that DCFS provided her with gas cards and had previously worked with her to provide transport to a visit with D.S., so respondent's lack of engagement was not due to circumstances such as transportation. Although respondent did testify to being sick during the months she stopped engaging in services, she affirmatively stated in her testimony that a reason for disengaging was her feeling of discouragement.

¶ 52    Even if we were to consider the period that respondent had made reasonable efforts—the first period before the permanency review of not even 9 months—the trial court also found that respondent had not made reasonable progress at any point in the case. The State's petition for termination of parental rights alleged that respondent was unfit pursuant to section 1D(b)(m)(ii) of the Adoption Act. That section provides that a parent may be found unfit for failure to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of the neglected or abused minor. 750 ILCS 50/1D(b)(m)(ii) (West 2024).

¶ 53    Reasonable progress is judged by an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *Id*. Here, the trial court found that respondent never made reasonable progress. Throughout the pendency of the case, respondent was inconsistent with her services and eventually discharged from substance abuse services and individual therapy due to lack of engagement. When she was attending, however, she was still not making progress towards the goal of reunification. Notably, respondent did not engage in parent counseling and family therapy because she was unable to apply the concepts learned in parenting classes to her life and did not understand the long-term effects of abandoning her child.

¶ 54    In sum, we cannot say that the trial court's determination that respondent was unfit as to reasonable efforts or reasonable progress was unreasonable, arbitrary, or not based on the evidence. As such, and because respondent does not challenge the best-interest prong of the analysis, the trial court's decision to terminate respondent's parental rights is on this ground is affirmed.

¶ 55    We next turn to respondent's argument that she received ineffective assistance of counsel. Respondent argues that she received ineffective assistance of counsel because her attorney failed to present evidence that demonstrated that respondent was not schizophrenic, that she had completed drug tests, that she had completed services, or that she was ill during the period that she stopped completing services.

¶ 56    "Illinois courts apply the same standard utilized in criminal cases to determine a parent's claim of ineffective assistance of counsel appointed under the Juvenile Court Act." *In re A.P.-M.*, 2018 IL App (4th) 180208, ¶ 39. To prevail on such a claim, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *People v. Cherry*, 2016 IL 118728, ¶ 24. "More specifically, the defendant must demonstrate that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* Judicial review of counsel's performance is highly deferential. *People v. McGrath*, 2017 IL App (4th) 150608, ¶ 38. A defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). Trial counsel's performance cannot be considered deficient because of a failure to present cumulative evidence. *People v. Dupree*, 2018 IL 122307, ¶ 51.

¶ 57    First, respondent fails to demonstrate deficient performance. Here, much of the evidence that respondent contends was not presented was, in fact, placed into evidence throughout the proceedings. Respondent's medications, history of drug and alcohol tests, and evidence that she completed a substance abuse evaluation were presented into evidence through service plans. So too was proof that she had attended some counseling and an initial psychiatric evaluation.

Additionally, respondent testified that she was ill during the period she ceased contact with DCFS. Trial counsel was not ineffective for failing to introduce additional documentation to further prove the veracity of the evidence. See *People v. Enis*, 194 Ill. 2d 361, 412 (2000) (finding defense counsel's performance was not deficient for failing to provide cumulative evidence).

¶ 58    Second, respondent fails to demonstrate prejudice. To the extent this argument rests upon the failure to present cumulative evidence, we cannot say its absence would have changed the outcome of the trial. See *People v. Smith*, 195 Ill. 2d 179, 190-91 (2000) (finding that the defendant could not satisfy the prejudice prong because defense counsel was not ineffective when he failed to call a witness to provide cumulative testimony). The entirety of respondent's argument on the prejudice prong is one conclusory statement that "Had the court been presented with all of the evidence regarding [respondent], it would have been hard-pressed to conclude by clear and convincing evidence that she was unfit." To satisfy the prejudice prong, the parent must prove that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *In re M.D.*, 2022 IL App (4th) 210288, ¶ 92. We are not persuaded.

¶ 59    In any event, the record here clearly demonstrates that the court's findings were not against the manifest weight of the evidence and supports the conclusion that respondent failed to make reasonable efforts. For months, respondent failed to visit her toddler son, contact or respond to her caseworker, or even apprise the child's guardian, DCFS, of her whereabouts. After respondent began participating in services, she failed to make progress, in large part because she stopped attending services and stopped contacting her caseworker for a number of months. Accordingly, we reject respondent's argument that she received ineffective assistance of counsel.

¶ 60 Finally, in her reply brief, respondent raises for the first time an argument concerning the correct inception of the nine-month period to assess reasonable efforts and reasonable progress in the unfitness statute. 750 ILCS 50/1(D)(m)(i), (ii) (West 2024). An argument raised for the first time on appeal in the reply brief need not be addressed by this court. *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 54. In any event, we point out to respondent that the statute has been amended since the decision in *In re Jacien B.*, 341 Ill. App. 3d 876 (2003), upon which she relies. Compare 750 ILCS 50/1(D)(m)(i), (ii) (West 2024) with 750 ILCS 50/1(D)(m)(i), (ii) (West 2002) (amending the period of assessment from "within 9 months after an adjudication" to "during any 9-month period following the adjudication.").

¶ 61                                    III. CONCLUSION

¶ 62 For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 63 Affirmed.