NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250509-U

NO. 4-25-0509

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 29, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.H., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
| Petitioner-Appellee, | ) | No. 22JA223 |
| v. | ) | |
| Breane G., | ) | Honorable |
| Respondent-Appellant). | ) | Katherine G. P. Legge, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Lannerd and Vancil concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court granted counsel's motion to withdraw and affirmed the trial court's judgment terminating respondent's parental rights, as no nonfrivolous issue could be raised on appeal.

¶ 2    Respondent, Breane G., appeals from the trial court's judgment finding her unfit and terminating her parental rights to her minor child, M.H. Respondent's counsel now seeks to withdraw pursuant to the procedure set forth in *Anders v. California*, 386 U.S. 738 (1967). See *In re S.M.*, 314 Ill. App. 3d 682, 685-86 (2000) (holding *Anders* applies to termination of parental rights cases and outlining the proper procedure appellate counsel should following when moving to withdraw). In his supporting brief and memorandum, counsel contends that he cannot offer a nonfrivolous argument in support of respondent's appeal. For the following reasons, we grant counsel's motion to withdraw and affirm the court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4                    A. Shelter Care Petition and Dispositional Hearing

¶ 5         On November 16, 2022, the State filed a petition alleging that M.H. was a neglected minor in that his environment was injurious to his welfare (see 705 ILCS 405/2-3(1)(b) (West 2022)). The petition alleged that M.H. was born in November 2022, and respondent, M.H.'s mother, (1) was using methamphetamine while pregnant, (2) tested positive for methamphetamine in September 2022, (3) did not have stable housing, (4) admitted to an Illinois Department of Children and Family Services (DCFS) investigator that she tested positive for methamphetamine during her pregnancy, and (5) was charged with battery in Tazewell County and had an active warrant for her arrest.

¶ 6         Following a shelter care hearing, the trial court entered an order on November 16, 2022, placing M.H. in the temporary custody of DCFS, with the right to place. The next hearing was scheduled for December 7, 2022. Respondent failed to appear.

¶ 7         On May 31, 2023, the trial court held a dispositional hearing at which the court found the allegations of the petition had been proven by a preponderance of the evidence and that M.H. was neglected. Immediately thereafter, the court entered a dispositional order, finding respondent unfit because of a "pattern of history of paramours who are not good for her," "drug abuse," "mental health," and her "association with" M.H.'s putative father, who is a sex offender with a long criminal history. The court made M.H. a ward of the court and named the guardianship administrator of DCFS as the guardian of M.H., with the right to place. The court ordered respondent to complete various tasks, including (1) cooperating with DCFS, (2) obtaining and maintaining stable housing, (3) visiting M.H. as scheduled, and (4) submitting to random drug and alcohol testing. The court also ordered respondent to successfully complete a psychological exam and any treatment recommended, a substance abuse assessment and any treatment recommended,

a parenting class, counseling, and a domestic violence class.

¶ 8                              B. Permanency Review Hearings

¶ 9              On December 6, 2023, the trial court held a permanency review hearing and found that respondent remained unfit. At that time, the permanency goal was for M.H. to return home in one year. The court also found that respondent "has made mixed efforts [but] has not made reasonable progress toward return home." The court's next permanency review hearing was held on June 26, 2024. At that time, the court found that respondent remained unfit but "has made reasonable efforts and progress toward return home." At the next permanency review hearing on September 18, 2024, the court found that respondent remained unfit and "has not made reasonable efforts [and] has not made reasonable progress toward return home." At that time, the permanency goal was changed to substitute care pending termination of parental rights.

¶ 10                              C. Termination Proceedings

¶ 11             On September 26, 2024, the State filed a petition for the termination of respondent's parental rights. The State alleged that respondent was unfit under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2024)) in that she failed to make reasonable progress toward the return of M.H. during the nine-month period of December 18, 2023, to September 18, 2024. Respondent filed an answer, denying the allegations of the petition.

¶ 12                              1. *Fitness Hearing*

¶ 13             On April 2, 2025, the trial court held a hearing on the petition. The State asked the court to take judicial notice of all prior orders in the case. Hearing no objection, the court granted the request.

¶ 14             Annabelle Arnold testified that she had been M.H.'s caseworker since November 2023 and was familiar with the tasks respondent was ordered to complete in this case. One of those

tasks was drug testing. Arnold testified that respondent did not complete all required drug tests during the relevant nine-month period. Additionally, on February 7, 2024, respondent tested positive for amphetamine and methamphetamine. Thereafter, on August 2, 2024, respondent had a hair follicle test that was positive for methamphetamine. After that, respondent increasingly failed to appear for drug tests.

¶ 15      Arnold testified that respondent was also ordered to complete substance abuse treatment. Arnold reported that respondent moved into a sober living house in March 2024 but was discharged unsuccessfully from treatment in July 2024. Based on her substance abuse evaluation, respondent was recommended to complete either inpatient or intensive outpatient treatment. Arnold reported that respondent failed to complete substance abuse treatment during the relevant nine-month period. After respondent was unsuccessfully discharged from the sober living house in July 2024, respondent moved in with "an individual who had a positive [Child Abuse and Neglect Tracking System] and [Law Enforcement Agencies Data System hit]," which "indicated child abuse or neglect." Arnold testified that such a home would not be appropriate for M.H.

¶ 16      Arnold testified that respondent was also ordered to complete counseling. During the relevant nine-month period, respondent was "on the verge of being discharged from counseling" because of "[e]xcessive absences with no excuse." During the relevant nine-month period, respondent was arrested for domestic battery. Arnold reported that respondent did not attend all her scheduled visits with M.H. during the relevant period and began missing visits in July 2024. Respondent blamed her absences on "mostly sickness and missing the bus." Arnold agreed that respondent "was not taking advantage of all the visits that were offered to her." Arnold testified that she was unable to put a plan into place for M.H. to return to respondent's care during the relevant nine-month period.

¶ 17    On cross-examination, respondent's counsel asked Arnold if she submitted a report to the trial court on May 30, 2024, opining that respondent "made satisfactory progress and effort." The State objected on hearsay grounds, and respondent's counsel asserted that Arnold's reports were business records. The court explained to counsel that Arnold's report was "an inadmissible document." When respondent's counsel again asked Arnold if she submitted a report to the court indicating that respondent "was making satisfactory progress and effort on May 30th of 2024," the State again objected on hearsay grounds, and the court instructed counsel, "Just ask her the question." Respondent's counsel then asked Arnold, "Was [respondent] making satisfactory progress on May 30th of 2024?" Arnold responded that from December 2023 to June 2024, respondent made satisfactory efforts and progress.

¶ 18    Later in Arnold's cross-examination, respondent's counsel asked Arnold how many visits respondent did not attend because she missed the bus. In response, Arnold stated, "I don't know the exact number or an estimation. I can look. I can reference my notes if you like." Respondent's counsel responded, "That'd be great." The trial court then interjected, asking Arnold if her "memory [was] exhausted" and if her "notes would refresh [her] memory sufficiently." Arnold responded affirmatively to both questions. The court then instructed respondent's counsel that he had "to give the witness time to refresh her memory." After reviewing her notes, Arnold stated that respondent missed four visits for sickness, two for missing the bus, and three for which she provided no reason.

¶ 19    Arnold testified that she offered housing resources to respondent and provided her with 30-day bus passes until September 2024. The State moved to enter into evidence respondent's criminal conviction for domestic battery, which occurred in January 2024. Without objection, the trial court admitted the conviction. The State rested, and respondent presented no evidence.

¶ 20    In closing arguments, the State conceded that respondent "was doing pretty well" from December 2023 to approximately June 2024, having made "reasonable efforts" and "reasonable progress" during that time. However, as of September 18, 2024, respondent was not making "reasonable efforts" or "reasonable progress," demonstrating "a complete turnaround in [respondent's] progress and [respondent's] ability to have her child returned home to her." The State noted that during the relevant nine-month period, respondent (1) committed "a crime of violence, domestic violence," (2) was "kicked out of her housing in the sober living," (3) tested positive for drugs, (4) had "a host of other missed drops," (5) "start[ed] missing more visits," (6) started living with someone with a "child abuse background," (7) was "on the verge of being discharged from counseling," and (8) did not "have stable housing." The State argued that rather than making "demonstrative movement toward the return home goal," respondent moved in "the opposite direction."

¶ 21    Respondent's counsel argued that the State failed to prove by clear and convincing evidence that respondent had "not made reasonable progress towards a return home" because the State conceded that respondent made progress from September 2023 to June 2024. M.H.'s guardian *ad litem* (GAL) asked the trial court to find that the State proved the allegations of the petition by clear and convincing evidence, stating, "Taken in totality, you have a period—kind of a bowl shape—of substance abuse, period of somewhat sobriety, and then back into substance abuse. During that time, there are missed visits, there's excuses as to why services haven't been done." The GAL noted that services were provided to respondent to help her reunify with M.H. but that "[t]hose services were either not completed successfully or, if they were, the knowledge gained from such services has not been employed or demonstrated."

¶ 22    The trial court concluded that the State proved the petition to terminate parental

rights by clear and convincing evidence. The court explained: "[T]he case came into care for meth, unsuitable housing, failing to cooperate with substance abuse treatment. And it ended *** with meth usage, failing to complete substance abuse treatment, and unsuitable housing, among other reasons as outlined in the evidence."

¶ 23                                              2. *Best Interest Hearing*

¶ 24        The best interest hearing was held on April 23, 2025. The hearing was scheduled to begin at 1:15 p.m. Respondent's attorney was present when the hearing began, but respondent was not. Respondent's counsel reported that he did not know where respondent was.

¶ 25        Arnold testified that she had contact with M.H. and his foster parents twice a month and was familiar with them. Arnold reported that respondent did not visit M.H. in February or March 2025 but visited him in April 2025. Arnold supervised that visit and observed that M.H. did not seem comforted by respondent's presence and did not seek out respondent for affection or attention. Arnold did not observe a bond between respondent and M.H. According to Arnold, M.H. "doesn't call [respondent] anything" but called both of his foster fathers "Daddy." Arnold testified that there is "[a]bsolutely" a bond between M.H. and his foster fathers. She explained that M.H. "loves to be around them." According to Arnold, M.H. seemed "[v]ery happy" in his foster fathers' care. Arnold had never witnessed M.H. seem very happy with respondent.

¶ 26        Keith W., one of M.H.'s foster fathers, testified that he had been with his partner, Bryant G., who is respondent's brother, for over five years. Keith W. read a statement to the trial court about how he and Bryant "have had the privilege of loving and caring for [M.H.] since the second day of his life" and that "becoming his permanent parents would mean the world to us." Keith discussed helping M.H. to grow socially "with his peers and extended family, including his *** half older brother, who lives in Missouri." Keith stated: "We are his people and he is our child

in every sense that matters." Finally, Keith told that court that M.H. "is not only wanted, he is cherished, he is supported, and he finds belonging with us. We are fully committed to being his forever home."

¶ 27     The GAL reported that he observed M.H. in his home with his foster fathers on several occasions and stated that M.H.'s foster fathers have consistently advocated for M.H. According to the GAL, Keith's and Bryant's lives are "centered around [M.H.] and you can see *** the bond that is there between them and him." He stated further: "Their utmost concerns are for him, what is best for him, and [they are] completely dedicated *** to him."

¶ 28     The State argued that it was in M.H.'s best interest to terminate respondent's parental rights, asserting that "every single" best interest factor supported termination. The GAL agreed that "all of the [best interest] factors *** weigh heavily in favor of termination." He pointed out that M.H. had spent almost his entire life with his foster fathers, who had provided M.H. with the only "home that he knows." He asked the court to enter an order terminating respondent's parental rights "so [M.H.] can achieve permanency with his people as soon as possible."

¶ 29     Respondent arrived in the courtroom at 1:42 p.m. Respondent's counsel requested that the trial court reopen proofs so respondent could testify. Over objections from the State and GAL, the court allowed respondent to testify.

¶ 30     Respondent testified that she felt it was in M.H.'s best interest to be with her because she is his mother and knows she "can take care of him." She explained that her children were "the best motivation to *** keep moving forward in [her] sobriety." On cross-examination, respondent admitted that she did not know (1) if M.H. was on any medication, (2) if M.H. was allergic to any foods, (3) M.H.'s favorite bedtime story, (4) if M.H. slept with a stuffed animal, (5) how M.H. liked to be put to bed, (6) when M.H. last had shots, (7) the name of the daycare

M.H. attended, or (8) the name of M.H.'s teacher.

¶ 31        After hearing respondent's testimony, the trial court reopened arguments, and the State asserted that "the only thing [respondent's] testimony did was to reaffirm why these dads are the best thing in [M.H.'s] life." The GAL argued that M.H.'s "best interest in permanency far outweighs [respondent's] interest in maintaining a parent-child relationship."

¶ 32        The trial court stated that it reviewed the best interest factors and specifically stated that the following factors favored termination of respondent's parental rights: (1) "physical safety and welfare, including the basics of food, shelter, health, and clothing," (2) "[d]evelopment of [M.H.'s] identity," (3) M.H.'s "family, cultural and religious ties," (4) M.H.'s bond with his foster parents, (5) M.H.'s "sense of security and familiarity" with his foster parents, and (6) M.H.'s "community ties." The court orally ruled that the State proved it was in M.H.'s best interest to terminate respondent's parental rights. Thereafter, the court entered a written order finding that the State proved by a preponderance of the evidence that it was in the best interest of M.H. to terminate respondent's parental rights.

¶ 33                              3. *Termination Order*

¶ 34        On May 7, 2025, the trial court entered a written order terminating respondent's parental rights. The court appointed the guardianship administrator of DCFS as guardian of M.H., with the power to consent to his adoption.

¶ 35        This appeal followed.

¶ 36                              II. ANALYSIS

¶ 37        On appeal, respondent's counsel stated that he considered three possible issues of error: (1) the trial court erred in finding respondent unfit; (2) the court erred in finding that it was in M.H.'s best interest to terminate respondent's parental rights; and (3) respondent was denied

effective assistance of counsel.

¶ 38                                    A. Fitness

¶ 39            The involuntary termination of parental rights involves a two-step process. 705 ILCS 405/2-29(2) (West 2024). The State must first prove by clear and convincing evidence that the respondent is unfit. *In re C.M.*, 305 Ill. App. 3d 154, 163 (1999). A parent can be found unfit for failing "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(m)(ii) (West 2024).

¶ 40            Reasonable progress, which is assessed under an objective standard, exists when a parent's compliance with the service plan and the trial court's directives "is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). A parent fails to make reasonable progress toward the return of the child when the parent fails " 'to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care.' " *In re C.N.*, 196 Ill. 2d 181, 217 (2001) (quoting 750 ILCS 50/1(D)(m) (West Supp. 1999)). A finding of unfitness is appropriate if "the court will not be able to return the child home in the near future, despite ample time and opportunity for compliance with the court's directives." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 55.

¶ 41            We will not reverse a trial court's finding of unfitness unless it is against the manifest weight of the evidence. *In re Dar. H.*, 2023 IL App (4th) 230509, ¶ 54. A court's finding is against the manifest weight of the evidence only "when the opposite conclusion is clearly apparent." *Dar. H.*, 2023 IL App (4th) 230509, ¶ 54. Under this standard, "we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and

demeanor of the parties and the witnesses and has a degree of familiarity with the evidence that a reviewing court cannot possibly obtain." *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002). We "must not substitute [our] judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *D.F.*, 201 Ill. 2d at 499.

¶ 42 Here, the State alleged that respondent was unfit for failing to make reasonable progress toward the return of M.H. during the nine-month period of December 18, 2023, to September 18, 2024. According to the trial court's orders, respondent was to complete various tasks, including (1) obtaining and maintaining stable housing, (2) visiting M.H. as scheduled, (3) submitting to random drug testing, (4) completing a substance abuse assessment and all recommended treatment, (5) participating in counseling, and (6) successfully completing parenting and domestic violence classes.

¶ 43 As appellate counsel noted, the evidence at the fitness hearing established that respondent had not completed "drug treatment or counseling, had not established stable or safe housing, had been convicted of domestic violence, had two positive drug tests for methamphetamine, had not consistently visited [M.H.], and remained unfit during the relevant nine-month period." While the State acknowledged that respondent made reasonable efforts and progress between December 2023 and June 2024, for the last few months of the nine-month period, respondent moved in "the opposite direction" by using drugs, missing visits, getting kicked out of "sober living" housing, living with someone with a "child abuse background," and being very near discharge from counseling because of excessive unexcused absences.

¶ 44 The evidence supported the trial court's conclusion that respondent failed to make reasonable progress during the relevant nine-month period because respondent had not corrected the conditions that caused M.H. to be a neglected minor. See *C.N.*, 196 Ill. 2d at 217. As the court

- 11 -

stated, "[T]he case came into care for meth, unsuitable housing, failing to cooperate with substance abuse treatment. And it ended *** with meth usage, failing to complete substance abuse treatment, and unsuitable housing."

¶ 45          Furthermore, the evidence established that despite M.H.'s progress during the beginning of the nine-month period, by the end of the nine-month period, M.H. could not be returned to respondent's care anytime soon. Thus, the trial court's finding of unfitness was not against the manifest evidence. See *Ta. T.*, 2021 IL App (4th) 200658, ¶ 55. We agree that appellate counsel could not "offer any non-frivolous argument that the court's [unfitness] finding was against the manifest weight of the evidence."

¶ 46                                      B. Best Interest

¶ 47          If a parent is found to be unfit, the State must then prove by a preponderance of the evidence that terminating parental rights is in the minor's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31. At this stage, the focus shifts from the parent to the child. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). "The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *D.T.*, 212 Ill. 2d at 364. Consequently, at a best interest hearing, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364.

¶ 48          When determining a minor's best interest, the trial court must consider the following factors "in the context of the child's age and developmental needs:"

              "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

              (b) the development of the child's identity;

- 12 -

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals, including the child's wishes regarding available permanency options and the child's wishes regarding maintaining connections with parents, siblings, and other relatives;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child, including willingness to provide permanency to the child, either through subsidized guardianship or through adoption." 705 ILCS 405/1-3(4.05) (West 2024).

¶ 49    The trial court's best interest determination will not be disturbed on appeal unless

it is against the manifest weight of the evidence. *J.B.*, 2019 IL App (4th) 190537, ¶ 33. We afford great deference to the court's determination, as it is in the best position to view the witnesses and judge their credibility. *J.B.*, 2019 IL App (4th) 190537, ¶ 33.

¶ 50          As appellate counsel noted, "[t]he evidence presented showed that [M.H.] has family and community ties with his foster parents, a loving, committed, and ongoing bond, and a stable and safe home with the foster parents." Arnold testified that M.H. appeared to have no bond with respondent, and, when questioned, respondent had no knowledge of important aspects of M.H.'s life, including his medical history and day-to-day activities. On the other hand, M.H.'s foster parents have cared for M.H. since he was only two days old, and they wanted to adopt M.H., providing him stability and permanence. While the focus at the best interest hearing shifts from the parent to the child (*D.T.*, 212 Ill. 2d at 364), respondent's testimony focused on what was best for her and her sobriety, rather than what was best for M.H.

¶ 51          The trial court determined that the relevant statutory factors, including M.H.'s physical safety and welfare, development of identity, sense of attachment, and ties to his family, culture, religion, and community, weighed heavily in favor of terminating respondent's parental rights. M.H. has spent nearly his entire life with his foster fathers, who have provided for him and met all his needs on a daily basis. M.H.'s foster fathers were willing to adopt M.H. and had a strong bond with him. M.H. was fully integrated into the foster fathers' lives, and they had facilitated contact with M.H.'s extended family, including his half-sibling. Accordingly, the court's determination that it was in M.H.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence. We agree that appellate counsel could not "offer any non-frivolous argument that the court's [best interest] finding was against the manifest weight of the evidence."

¶ 52                                    C. Assistance of Counsel

¶ 53            In a proceeding to terminate parental rights, parents have a statutory right to counsel. 705 ILCS 405/1-5(1) (West 2024). "Recognizing parents' right to counsel would be an empty gesture without a corresponding expectation that counsel render effective assistance." *In re I.W.*, 2018 IL App (4th) 170656, ¶ 45. "Therefore, parents have the statutory right to effective assistance by counsel." *I.W.*, 2018 IL App (4th) 170656, ¶ 45.

¶ 54            To determine if a parent received ineffective assistance in a proceeding to terminate parental rights, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *I.W.*, 2018 IL App (4th) 170656, ¶ 46. Under that standard, counsel is ineffective if (1) his representation fell below an objective standard of reasonableness and (2) his deficient performance prejudiced the parent. *In re M.D.*, 2022 IL App (4th) 210288, ¶ 92. To satisfy the prejudice prong, the parent must prove that a reasonable probability exists that, but for counsel's deficient performance, the result of the proceeding would have been different. *M.D.*, 2022 IL App (4th) 210288, ¶ 92. "A reviewing court 'may dispose of an ineffective assistance of counsel claim by proceeding directly to the prejudice prong without addressing counsel's performance.' " *M.D.*, 2022 IL App (4th) 210288, ¶ 93 (quoting *People v. Hale*, 2013 IL 113140, ¶ 17).

¶ 55            In this case, at the fitness hearing, respondent's counsel seemed to have some problems understanding and applying evidentiary rules. For example, counsel repeatedly attempted to question Arnold regarding a statement from one of her reports, even though that statement was hearsay and inadmissible at the fitness hearing. See *M.D.*, 2022 IL App (4th) 210288, ¶ 82. Additionally, respondent's counsel told Arnold that she could refer to her notes without first laying the proper foundation for her to refresh her recollection. See *People v. Shatner*, 174 Ill. 2d 133, 153 (1996) (stating a witness' memory can be refreshed by a writing only after it

has been established that the witness has no independent memory of the facts in question). Finally, respondent's counsel failed to admit into evidence two certificates respondent earned during the relevant nine-month period showing that she completed parenting and domestic violence classes in March 2024.

¶ 56    Nevertheless, as appellate counsel noted, respondent "cannot demonstrate prejudice." Although respondent's counsel was unsuccessful in having Arnold's report admitted into evidence, counsel was successful in obtaining testimony from Arnold about what she stated in the report, specifically, that respondent made satisfactory efforts and progress from December 2023 to June 2024. Additionally, with the trial court's assistance, respondent's counsel was eventually able to obtain the testimony he sought from Arnold about the causes of respondent's missed visits with M.H. Finally, respondent's certificates of completion of parenting and domestic violence classes supported that respondent made reasonable efforts and progress during the first half of 2024. However, as appellate counsel noted, that evidence would not have rendered the court's findings as to fitness or best interest "against the manifest weight of the evidence due to [respondent's] continued drug usage and unstable and unsafe housing."

¶ 57    As the State argued at the fitness hearing, respondent was making progress at the beginning of the nine-month period but moved in "the opposite direction" for the last few months of the period, when she was "kicked out of her housing in the sober living," tested positive for drugs, had "a host of other missed drops," "start[ed] missing more visits," began living with someone with a "child abuse background," and was "on the verge of being discharged from counseling." The State proved that respondent failed to make reasonable progress during the nine-month period because she had not corrected the conditions that caused M.H. to be taken into care. See *C.N.*, 196 Ill. 2d at 217. Thus, the result of the fitness hearing would not have been

different if counsel had entered into evidence the certificates showing respondent's completion of classes during the first few months of the relevant nine-month period.

¶ 58 Additionally, the result of the best interest hearing would not have been different if respondent's counsel had presented evidence of respondent's completion of parenting and domestic violence classes. The evidence at the best interest hearing established that M.H. had never lived with respondent on a day-to-day basis in his two years of life and had no connection or bond with her. However, M.H. had a strong bond with his foster fathers, whom he called "Daddy" and have met all his social, emotional, and physical needs since he was just a few days old. Based on these circumstances, we agree with appellate counsel's contention that he "cannot offer any non-frivolous argument that but for counsel's deficient performance the result would have been any different."

¶ 59 After examining the record, we agree that the issues counsel identified lack arguable merit, and we have identified no other arguably meritorious issues. We therefore grant counsel's motion to withdraw and affirm the trial court's judgment.

¶ 60 III. CONCLUSION

¶ 61 For the reasons stated, we grant respondent's appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 62 Affirmed.