NOTICE
Decision filed 03/03/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250833-U

NO. 5-25-0833

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* PEYTON B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois. | ) | Madison County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-JA-249 |
| | ) | |
| Joshua B., | ) | Honorable |
| | ) | Janet R. Heflin, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Justices Vaughan and Hackett concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We grant appellate counsel's motion to withdraw and affirm the trial court's order terminating the respondent's parental rights to his child where the evidence supported the trial court's findings, the respondent received effective assistance of counsel, and there is no meritorious argument to the contrary that appellate counsel can raise on behalf of the respondent.

¶ 2    The respondent, Joshua B. (Father), appeals an order of the circuit court of Madison County terminating his parental rights to his minor daughter. Attorney Donna Polinske was appointed to represent Father on appeal and has filed a motion to withdraw as counsel pursuant to *Anders v. California*, 386 U.S. 738 (1967). Polinske argues that there are no arguably meritorious claims to be raised on behalf of Father because (1) the trial court's findings of unfitness were supported by the evidence, (2) the trial court's determination that termination of parental rights was in the

1

minor's best interest was likewise supported by the evidence, and (3) Father received effective assistance of counsel. We grant Polinske's motion to withdraw and affirm the order of the trial court terminating Father's parental rights.

¶ 3                                    I. BACKGROUND

¶ 4       This case comes has an unusual procedural history. It began on August 31, 2021, when the State filed a juvenile petition alleging neglect of the minor, Peyton B. (born November 2014), by her paternal grandmother, Belinda D., who was then her legal guardian.[1] Attached to the petition was a request for shelter care prepared by the Department of Children and Family Services (DCFS). The incident giving rise to the petition took place on August 5. DCFS alleged in the shelter care request that the minor's older sibling, Hayleigh B. (born October 2011), who is disabled and has extensive medical needs, suffered burns while being bathed by her grandfather, Anthony D., but the grandparents did not seek medical care for her until the following day.[2] Their explanation for Hayleigh's injuries was that Anthony accidentally turned the hot water tap to a higher setting. Belinda did not allow the emergency medical services personnel to enter the home, but she showed them photographs of the home, which revealed that it was "not clean."

¶ 5       In the juvenile petition, the State alleged that Peyton was neglected pursuant to section 2-3(1)(a) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(a) (West 2020)) in that her guardian failed to provide her with proper or necessary support, education, or medical or other remedial care. The petition alleged that (1) the minor's guardians failed to regularly take her sibling to required medical appointments; (2) her sibling suffered burns with no adequate explanation; (3) her guardian denied emergency medical services workers entry into the home to assess her

---

[1]The guardianship has since been terminated, and Belinda is not a party to this appeal.

[2]Both Anthony and Belinda were listed as guardians in the shelter care request; however, Anthony was not named as a respondent in the juvenile petition and has never been a party in these proceedings. A separate juvenile case was filed regarding Hayleigh; however, her case is not at issue in this appeal.

sibling's condition; (4) the minor's medical providers believed that she, too, was suffering from medical neglect; (5) the home was reported to be in "deplorable" condition; and (6) the guardians had not cooperated with intact family services.

¶ 6　The trial court held a shelter care hearing that same date. Following the hearing, the court entered an order continuing the case under supervision for 12 months. The order stated that the respondent guardian stipulated to the allegations in the juvenile petition and agreed to comply with all DCFS requirements.

¶ 7　On April 12, 2022, the State filed a petition to revoke the order for continuance under supervision. It alleged that the guardian failed to comply with the requirements of the supervision order and that the guardian was involved in an incident of domestic violence in a public place in the presence of the minor. That day, the court appointed a guardian *ad litem* (GAL) for the minor and entered a temporary custody order placing the minor in the custody of DCFS.

¶ 8　On June 21, 2022, the court entered an adjudicatory order finding the minor to be neglected as alleged in the petition. The court set the matter for a dispositional hearing on July 19, 2022. Although the matter came for a hearing that day, the court did not enter a dispositional order at that time. Eventually, in June 2024, the court entered a dispositional order *nunc pro tunc* to June 21, 2022.

¶ 9　On January 17, 2023, the trial court entered a permanency order terminating the guardianship and ordering DCFS to conduct a diligent search for the minor's biological parents. Subsequent permanency review reports indicate that DCFS located Father shortly after his February 17, 2023, release from prison and that he was rated as unsatisfactory for all service plan

3

requirements. Despite conducting multiple diligent searches, DCFS was unable to locate the minor's mother, Curshell B. (Mother).[3]

¶ 10    On March 27, 2024, DCFS filed a permanency report in which it recommended changing the goal from return home within 12 months to substitute care pending determination of termination of parental rights. On April 9, 2024, the court entered an order changing the goal in accordance with that recommendation.

¶ 11    On June 25, 2024, the State filed a petition seeking to terminate Father's and Mother's parental rights. At that point, the State had not filed an amended juvenile petition naming Father and Mother as respondents. Over the next several months, the State filed three amended petitions to terminate but did not correct the oversight.

¶ 12    On March 18, 2025, the trial court entered an order directing DCFS to conduct another diligent search for the minor's mother and to file an amended juvenile petition naming Father and Mother as respondents. Pursuant to this order, the State filed an amended juvenile petition on March 20, 2025. The petition named Father and Mother as respondents, repeated the allegations of neglect in the original petition, and further alleged that Mother abandoned the minor and that Father was incarcerated and unable to care for the minor.

¶ 13    On May 6, 2025, the court held a hearing, after which it entered an adjudicatory order finding the minor to be neglected by both parents and a dispositional order making her a ward of the court. On the same date, the court entered a permanency order maintaining a goal of substitute care pending termination of parental rights.

¶ 14    On August 6, 2025, the State filed the amended petition to terminate parental rights at issue in this appeal. The petition alleged that Father was an unfit parent on the grounds that (1) he was

_____

[3]Mother did not appear before the trial court and is not a party to this appeal.

4

depraved because he had at least three felony convictions, at least one of which occurred within five years before the petition was filed (750 ILCS 50/1(D)(i) (West 2024)); and (2) the minor was currently a ward of the court and Father was incarcerated at the time the petition was filed, had been repeatedly incarcerated due to criminal convictions, and was prevented from discharging his parental responsibilities because of his repeated incarcerations (*id.* § 1(D)(s)). The petition alleged that Mother was unfit for (1) failure to demonstrate a reasonable degree of interest, concern, or responsibility for the minor's welfare (*id.* § 1(D)(b)); (2) abandonment of the minor (*id.* § 1(D)(a)); and (3) desertion of the minor for more than three months before the proceedings were commenced (*id.* § 1(D)(c)).

¶ 15 The matter proceeded to a hearing on the petition to terminate parental rights on September 23, 2025. The first witness to testify for the State during the fitness portion was Elias Daugherty, a child welfare specialist for DCFS who served as the minor's caseworker from January 2023 until January 2025. Daugherty noted that he had the opportunity to review the entire case file before the hearing.

¶ 16 Daugherty testified that when the case opened, a legal guardianship was in place and Father was not exercising parental responsibility for the minor. He explained that, although Father was not in prison at that time, the guardianship had been established because "of the time he spent in prison." Daugherty stated that Father "was readmitted to the Lincoln Correctional Facility on February 17, 2023." Although he was released shortly thereafter, he was admitted again on July 21, 2023. Daugherty testified that Father was released again on March 1, 2024, but returned to prison on April 23, 2024. At the time of the hearing, Father remained in prison with a projected parole date of 2026. Daugherty opined that Father would be unable to stay out of prison. He further opined that both parents were unfit.

¶ 17    On cross-examination, Daugherty testified that Father's service plan included cooperation, parenting classes, domestic violence classes, and substance abuse classes. Daugherty noted, however, that Father indicated he was unable to access any of these services in prison. Daugherty spoke to Father's counselor at the prison, who told him only that resources were limited.

¶ 18    The State's next witness was Lanna Harmon, who served as the minor's caseworker from January 2025 until she began maternity leave in August 2025. She testified that Father was in prison the entire time she was the caseworker. She explained that his visits with the minor took place over the telephone once a month. Based on her observations of their visits, Harmon believed that Father and the minor "seem[ed] to have a decent relationship over the phone."

¶ 19    Father testified on his own behalf. He first explained that he allowed his mother to become the caretaker for his daughters because he was incarcerated. He testified that he "lived with them" during the periods he was not in prison. On cross-examination, Father acknowledged that his mother had cared for both the minor and her sister, Hayleigh, for their entire lives. He testified that the legal guardianship was established a few months after the minor was born. Father indicated that he was set to be released from prison in approximately March or April of 2026.[4]

¶ 20    Without objection, the court admitted into evidence and took judicial notice of certified copies of Father's criminal convictions. Those records indicate that Father had a June 2024 conviction for domestic battery with a prior domestic battery conviction in Clinton County case No. 24-CF-65, a July 2023 conviction for domestic battery with a prior domestic battery conviction in Clinton County case No. 23-CF-89, a March 2022 conviction for retail theft (over $300) in Madison County case No. 21-CF-1017, a March 2022 conviction for unlawful possession of

---

[4]Although both Father and Daugherty testified that Father was scheduled to be released in 2026, the best-interest report indicates that he was due to be released in June 2027. This discrepancy has no impact on our resolution of the issues presented in this appeal.

methamphetamine in Madison County case No. 20-CF-454, a December 2021 conviction for aggravated battery in St. Clair County case No. 20-CF-725, and a December 2021 conviction on four counts of burglary in St. Clair County case No. 21-CF-1324.

¶ 21    The court announced its fitness determination from the bench. The court first found that the State proved depravity by clear and convincing evidence, explaining that Father had been convicted of at least three felonies, at least one of which occurred within five years before the filing of the petition to terminate. In addition, the court expressly found that "repeated incarcerations have prevented the respondent father from discharging his parental responsibilities for the minor."

¶ 22    The court adjourned briefly before proceeding to the best-interest portion of the hearing. Harmon, the caseworker from January to August 2025, once again testified for the State. She testified that the minor was placed in her current foster home in February 2024.[5] The placement is a traditional foster home. Harmon testified that the minor was comfortable in her placement, bonded with both foster parents, and fully integrated into their family. Harmon testified that the foster parents met the minor's needs. She stated, "They advocate on her behalf in terms of education, in terms of medical." She noted that the minor was the only child in the home and that she had her own bedroom. In addition, the home meets DCFS standards.

¶ 23    Harmon testified that the foster parents wanted to adopt the minor and had signed permanency commitments. She further testified that the minor indicated to her that she wanted to stay where she was and to be adopted by her foster parents. Harmon believed that it was in the minor's best interest to terminate the rights of both parents.

[5]Prior to that time, the minor was placed with her great-grandmother, Norma M. However, that was not intended to be a long-term or permanent placement due to Norma's health concerns, and the minor was moved to a traditional foster home after her grandmother and former guardian was reported to be living in Norma's home.

¶ 24    On cross-examination by Father's attorney, Harmon testified that the minor had never demonstrated any reservations about attending visits with her father, and further, that she would like to continue to have a relationship with him if she were adopted. Harmon believed the foster parents would be willing to facilitate phone visits between the minor and Father. She noted that they had spoken with him, but she did not know the contents of those conversations.

¶ 25    Regarding visitation with Hayleigh, Harmon explained that the siblings had four-hour visits every other month. DCFS provided the minor with transportation to attend those visits. We note that, although not specified by Harmon during her testimony, the court was aware that Hayleigh had been admitted to a long-term care facility in Indiana, as noted in the permanency reports. Harmon testified that although the foster parents did not take the minor to visit her sister, they had expressed a willingness to do so when DCFS was no longer involved.

¶ 26    Finally, Harmon testified that the minor lived with her grandmother in Trenton, Illinois, before coming into care and that most of her biological family lived in Trenton. When the minor was first placed in her foster home, the foster parents likewise lived in Trenton; however, they subsequently moved to Highland during the summer of 2025, which put the minor in a different school district.

¶ 27    Pursuant to questioning by the GAL, Harmon clarified that the minor stated multiple times that she wanted to remain with her foster parents and be adopted by them and that she also stated that she wanted to continue to have calls with Father. Harmon further testified that the foster parents indicated that they would be willing to allow continued contact between the minor and Father "as long as [he] is continuing to stay sober and continuing to stay consistent."

¶ 28    The State's next witness was Arnella Hillsman, the DCFS caseworker filling in for Harmon during her maternity leave. Hillsman testified that she, too, discussed adoption with the minor and

8

noted that the minor understood that being adopted meant that further contact with her biological family would be up to her foster parents. The minor indicated to Hillsman that she wanted to be adopted.

¶ 29 On cross-examination by Father's attorney, Hillsman indicated that to her knowledge, there were no plans to maintain contact between the minor and her biological family after adoption. On cross-examination by the GAL, Hillsman noted that she had two conversations about adoption with the minor. She further testified that she believed there was a bond between the minor and her foster parents.

¶ 30 On redirect examination, Hillsman testified in more detail about the minor's relationship with her sister. She explained that Hayleigh was unable to communicate, but she smiled when the minor entered the room for visits and the minor "interacts with her as much as she can." Hillsman further explained that to facilitate interaction, she provided the minor with something to read to Hayleigh during their visits. She noted that it was difficult for the minor to do anything to interact with Hayleigh other than the things she gives her to do during visits. She testified, however, "I think that Peyton understands that that's her sister and that makes a difference."

¶ 31 Hillsman testified that the minor's visits with her sister took place in Indiana, and the drive to get there was four and a half hours each way. Although this made for a long day, the minor had never complained. As far as Hillsman knew, the minor would like to continue to visit with her sister after being adopted. However, she did not know whether the foster parents were willing to facilitate that relationship.

¶ 32 The trial court admitted into evidence a best-interest report prepared by Hillsman. Much of the pertinent information in the report was covered during the hearing. However, the report also indicated that the caseworker discussed the possibility of adoption with the minor "at length," that

the minor indicated she understood she might not see her sister as frequently if she were adopted, and that the minor considered her foster parents' adult children to be her siblings.

¶ 33　Father did not testify or present evidence during the best-interest portion of the hearing. The court stated on the record that it found by a preponderance of the evidence that termination of parental rights was in the minor's best interests.

¶ 34　The trial court entered a written order terminating the parental rights of both Father and Mother on the same date, September 23, 2025. The trial court first found both parents unfit on all statutory grounds alleged by clear and convincing evidence. With regard to the minor's best interest, the court made the following factual findings: (1) the foster parents wanted to adopt the minor and signed permanency commitments; (2) the minor had a strong bond with her foster family; and (3) the foster parents were meeting her emotional, psychological, and financial needs. The court thus concluded that termination of parental rights was in the best interest of the minor.

¶ 35　Father filed a timely notice of appeal on October 15, 2025. Polinske filed a motion to withdraw on December 9, 2025. On our own motion, this court allowed Father until January 15, 2026, to file any *pro se* brief, memorandum, or other documents. We subsequently granted Father's motion requesting an extension of this deadline, allowing him to file a response by February 6, 2026; however, Father did not file a response within the time allotted.

¶ 36　　　　　　　　　　　　　　II. ANALYSIS

¶ 37　In a memorandum supporting her motion to withdraw, Polinske states that she considered raising the following issues: (1) whether the trial court's finding of unfitness was against the manifest weight of the evidence, (2) whether the court's best-interest determination was against the manifest weight of the evidence, and (3) whether Father received ineffective assistance of trial

10

counsel. Polinske concluded that all three issues would lack merit. For the reasons that follow, we agree.

¶ 38                                    A. Unfitness

¶ 39    Termination of parental rights involves a two-step process. First, the State must prove that the respondent parent is unfit by clear and convincing evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 62. If the trial court finds a parent unfit, the proceedings progress to the second step, during which the State must prove by a preponderance of the evidence that termination of parental rights is in the children's best interests. *Id.* ¶ 73.

¶ 40    We give great deference to the trial court's unfitness findings because that court had the opportunity to observe and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). As such, we will reverse a finding of unfitness only if it is against the manifest weight of the evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 63. A decision is against the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 41    Here, the State asserted two grounds for unfitness, alleging that (1) Father is depraved (750 ILCS 50/1(D)(i) (West 2024)) and (2) the minor was in the care of DCFS, Father was incarcerated when the petition to terminate was filed, and his repeated incarceration prevented him from discharging his parental responsibilities (*id.* § (D)(s)). Because a parent may be found unfit if the State proves any one of the statutory grounds for unfitness by clear and convincing evidence, we will affirm the trial court's decision if the evidence supports its finding as to any of these grounds. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶¶ 63-64.

11

¶ 42    The Illinois Supreme Court has defined depravity as " 'an inherent deficiency of moral sense and rectitude.' " *In re J.A.*, 316 Ill. App. 3d 553, 561 (2000) (quoting *Stalder v. Stone*, 412 Ill. 488, 498 (1952)). Section 1(D)(i) of the Adoption Act creates a rebuttable presumption of depravity if the respondent parent has been convicted of at least three felonies, at least one of which was entered within five years of the date on which the petition to terminate was filed. 750 ILCS 50/1(D)(i) (West 2024). A rebuttable presumption effectively creates a *prima facie* showing as to a particular issue in a case. *In re J.A.*, 316 Ill. App. 3d at 562. As such, its practical effect is to require the opposing party to present evidence to rebut the presumption. *Id.* However, a parent in termination proceedings is not required to rebut the presumption of depravity by clear and convincing evidence. *In re P.J.*, 2018 IL App (3d) 170539, ¶ 14.

¶ 43    Here, the evidence established that Father was convicted of nine felonies, all of which were entered within five years before the petition to terminate his parental rights was filed. Thus, the statutory presumption of depravity clearly arose, and Father was required to present some evidence to rebut it. The presumption of depravity may be rebutted through evidence tending to show that a parent has been rehabilitated or is able to parent a child safely. See, *e.g.*, *In re A.M.*, 358 Ill. App. 3d 247, 254 (2005); *In re Shanna W.*, 343 Ill. App. 3d 1155, 1167 (2003); *In re J.A.*, 316 Ill. App. 3d at 563; *In re M.G.*, 2022 IL App (5th) 210366-U, ¶ 22.[6] Father did not present any such evidence in this case, and in light of the fact that he was still in prison and unable to parent his child when the termination proceedings took place, we do not believe there is any evidence he could have presented to demonstrate that he was rehabilitated or able to parent the minor safely. We therefore

---

[6]*In re M.G.* is cited as persuasive authority in accordance with Illinois Supreme Court Rule 23(e)(1) (eff. Jan. 1, 2021).

conclude that the court's finding of depravity was supported by the evidence, and we agree that any contrary contention would lack merit.

¶ 44    Although we may affirm the court's finding of unfitness on this basis alone, we likewise find that the evidence supported the court's determination that Father's repeated incarceration prevented him from discharging his parental responsibilities. Section 1(D)(s) of the Adoption Act provides that a parent is unfit if the child is in the temporary custody of DCFS, the parent is incarcerated when the petition to terminate parental rights is filed, the parent "has been repeatedly incarcerated as a result of criminal convictions," and the repeated incarceration has prevented the parent from discharging his parental responsibilities for the minor. *In re D.D.*, 196 Ill. 2d 405, 417-18 (2001) (quoting 750 ILCS 50/1(D)(s) (West 1998)). In determining whether a parent is unfit on this ground, the trial court should consider "the overall impact" the parent's incarceration has on his ability to fulfill his parental responsibilities, including "circumstances which may flow from the fact of repeated incarceration, such as the diminished capacity to provide financial, physical, and emotional support for the child." *Id.* at 421. The mere fact of repeated incarceration does not always warrant a finding of unfitness; rather, each case must be decided based on its own unique facts and circumstances. *Id.* at 422. "Under different circumstances, a parent's repeated incarceration *** may not prevent the parent from discharging his or her parental duties and, therefore, would not establish that parent's unfitness." *Id.*

¶ 45    Here, there is no dispute that the minor was in the custody of DCFS or that Father was incarcerated when the petition was filed. In addition, the evidence established that Father was in and out of prison between February 2023 and September 2025. Although the record does not contain a precise timeline of his incarceration prior to that time, it does reveal that Father was sentenced to prison on multiple felony convictions occurring between 2021 and 2023. Moreover,

13

Father himself acknowledged that his mother became the minor's legal guardian shortly after her birth due to his incarceration, thus demonstrating that his repeated incarceration prevented him from discharging his parental responsibilities. This evidence is more than sufficient to support the trial court's finding of unfitness on this ground, and we find that any argument to the contrary would lack merit.

¶ 46                                    B. Best Interest

¶ 47    Once the trial court finds a parent unfit, the focus shifts to the child. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 73. During the best-interest phase, the parent's interest in maintaining a relationship with the child "must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004).

¶ 48    In deciding whether termination of parental rights is in a child's best interest, the trial court must consider the following statutory factors: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background and ties; (4) the child's sense of attachment; (5) the child's wishes; (6) the child's community ties; (7) the need for permanence and stability and the continuity of the child's relationships with parental figures, siblings, and other family members; (8) the uniqueness of each child and family; (9) the risks inherent in substitute care; and (10) the preferences of the individuals available to provide care. 705 ILCS 405/1-3(4.05) (West 2024). Although the court must consider all applicable statutory factors, it is not required to refer to each individual factor in rendering its decision. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 49    As with the trial court's unfitness finding, we review its best-interest finding to determine whether it is against the manifest weight of the evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 74. As stated previously, this occurs "if the opposite conclusion is apparent or when

14

findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 50    Here, the trial court never explicitly referred to the statutory best-interest factors. Nevertheless, we believe the record supports its conclusion that, in view of these factors, termination of parental rights was in the minor's best interest. In particular, there was evidence that the minor's physical safety and well-being were protected in the foster home (705 ILCS 405/1-3(4.05)(a) (West 2024)), that she was attached to her foster parents and their adult children (*id.* § 1-3(4.05)(d)), that she wanted to be adopted by her foster parents and they wanted to adopt her (*id.* § 1-3(4.05)(e), (j)), and that the DCFS caseworkers had no concerns regarding the care provided to the minor by her foster family (*id.* § 1-3(4.05)(i)). There was some evidence that the minor's contact with her biological father and sister might be less frequent after being adopted; however, there was also evidence that the foster parents were willing to facilitate the minor's relationships with her father and sister (*id.* § 1-3(4.05)(g)).

¶ 51    Considering the record as a whole, we do not believe the trial court's best-interest determination was unreasonable or arbitrary, nor do we believe that the opposite conclusion was clearly evident. See *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. We find that any claim that the court's decision was against the manifest weight of the evidence would lack merit.

¶ 52                    C. Ineffective Assistance of Counsel

¶ 53    Parents in termination proceedings have a right to effective assistance of counsel. *In re M.D.*, 2022 IL App (4th) 210288, ¶ 92 (citing *In re Br. M.*, 2021 IL 125969, ¶ 42); see also 705 ILCS 405/1-5(1) (West 2024). Although the source of this right to counsel is statutory rather than constitutional, the Illinois Supreme Court has held that the proper standard for evaluating claims of ineffective assistance of counsel in termination proceedings is the two-prong test set forth in

*Strickland v. Washington*, 466 U.S. 668 (1984), used to evaluate such claims in criminal cases. *In re Br. M.*, 2021 IL 125969, ¶ 43. Under that test, the parent must demonstrate that (1) counsel's performance fell short of an objective standard of competence and (2) the parent suffered prejudice as a result. *In re M.D.*, 2022 IL App (4th) 210288, ¶ 92. To demonstrate prejudice, the parent must establish a reasonable probability that but for counsel's errors, the result would have been different. *Id.* To prevail, a parent must satisfy both parts of the *Strickland* test. *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 42.

¶ 54     Here, we are unable to identify any deficiency in the performance of Father's appointed attorney during the trial court proceedings. Counsel cross-examined the State's witnesses concerning the limits of Father's ability to comply with his service plans while incarcerated and the potential adverse impact adoption might have on the minor's continued relationships with her biological family, particularly Father and Hayleigh. Moreover, in light of the overwhelming evidence we have discussed, we do not believe a different result would have been reasonably probable had counsel done anything differently. As such, we agree that any claim of ineffective assistance of counsel would lack merit.

¶ 55                                III. CONCLUSION

¶ 56     For the foregoing reasons, we grant appellate counsel's motion to withdraw and we affirm the order of the trial court terminating Father's parental rights.


¶ 57     Motion granted; order affirmed.